SOUTHWESTERN ELECTRIC POWER COMPANY, a corporation

v.

BURLINGTON NORTHERN, INC., a corporation, The Kansas City Southern Railway Company, a corporation, and Louisiana & Arkansas Railway Company, a corporation.

Civ. A. No. M–79–96–CA.

United States District Court, E. D. Texas, Marshall Division.

Aug. 13, 1979.

**514**

Curtis Berg, Gen. Sol., for Burlington Northern, Inc., St. Paul, Minn., Walker Friedman, of Law, Snakard, Brown & Gambill, Fort Worth, Tex., for defendant Burlington Northern, Inc.

Howard Coghlan, Longview, Tex. and John M. Cleary, of Donelan, Cleary, Wood & Maser, Washington, D. C., for plaintiff.

J. David Hughes, Asst. Atty. Gen., Austin, Tex., for the State of Texas.

## MEMORANDUM OPINION

PARKER, District Judge.

This is an action for a declaratory judgment and an injunction brought by Plaintiff, Southwestern Electric Power Company, pursuant to 28 U.S.C. §§ 2201 and 2202. Plaintiff seeks to prevent the breach of a contract it claims was made with Defendants Burlington Northern, Inc., The Kansas City Southern Railway Company, and Louisiana & Arkansas Railway Company via extended negotiations that culminated in a letter of understanding dated September 20, 1974.

This Court entered a temporary restraining order on July 30, 1979, enjoining the Defendant railroads from publishing a tariff higher than that provided for by the September 20, 1974, agreement as escalated. Plaintiff's motion for a preliminary injunction was considered by this Court on August 8, 1979, at which time, on its own motion, the Court extended the temporary restraining order for five (5) days until August 13, 1979. At the August 8th hearing, the Court granted the State of Texas's motion, through its Attorney General, to intervene in the case.

The principal issue in the case, while appearing on its face to be quite complex, is in reality a simple one: can the railroads, as common carriers, contract with shippers for a freight rate that is binding on the railroads until such time as the I.C.C. determines that the rate has become unlawful or no longer falls within the zones of reasonableness as established by the I.C.C.?

This Court holds that the railroads can so contract and, having done so, can be held to the terms of the contract. This holding then raises the question of whether this Court is interfering with the suspension powers of the I.C.C., if a carrier is enjoined from publishing a tariff that the I.C.C. has declined to suspend.

In the opinion of this Court, the ruling in this case does not result in an impairment of administrative jurisdiction but is reflective of a proper accommodation of the authorities of the Court and the I.C.C. under the primary jurisdiction doctrine.

The Plaintiff contends that in anticipation of an ever-increasing problem associated with the availability of fuel oil and natural gas, Southwestern Electric Power Company, in the early seventies, made a long-term commitment to the use of coal to provide electricity to its customers in Texas, Louisiana, and Arkansas. This commitment prompted an extended negotiating process with various railroads serving areas of the country that were coal-producing regions. The Burlington Northern's negotiating efforts with the Plaintiff were successful and resulted in Southwestern Electric Power Company's contracting, in reliance upon the preliminary quotations and terms of an agreement with Burlington Northern, for some 175-million tons of coal. The coal was located in Gillette, Wyoming, and was an area served exclusively by Burlington Northern. Defendants Kansas City Southern and Louisiana & Arkansas railroads are connecting lines that are used by the Burlington Northern for the transportation of coal from Wyoming to Texas. The contract between Plaintiff and Burlington Northern, as eventually concluded, contained an agreed-upon escalation rate for tariffs to be published by Burlington Northern with the I.C.C., and was complied with by all parties until the summer of 1979, when Burlington Northern announced its intention to breach the contract and publish a rate of $15.86 per ton, as opposed to the rate of $12.12 per ton provided for in the escalation provisions of the contract.

The Burlington Northern concedes deviation from the contract rate and offers justification by contending that the letter of understanding dated September 20, 1974, is not of itself, or reflective of, a contract and, even if it were, such contracts are unenforceable, either void or voidable, and are not binding on the railroad. The railroad's position before this Court was that the managerial prerogative of the railroad in the initiation of rates with the I.C.C. was and is a right incapable of being fettered by contract or waived by the same managerial prerogative.

Essentially, the railroad says that anyone who contracts with the railroad proceeds at their own risk and, regardless of reliance, regardless of the commitment of millions of dollars by shippers, the railroad may breach the contract and abandon the rate schedule by the exercise of its inalienable right of managerial perogative, relying on *Farley Terminal Co. v. Atchison, Topeka & SF Ry.,* 522 F.2d 1095 (9th Cir. 1975), cert. denied 423 U.S. 996, 96 S.Ct. 423, 46 L.Ed.2d 370 (1975).

This Court rejects the Defendant railroad's contention that *Farley* controls this case and prevents this Court from entering an injunction to enforce the contract. *Farley* is distinguished from the present case because there is not an I.C.C. decision in effect that will be interfered with by this Court's preliminary injunction. This opinion is not in conflict with *Farley*, and is entirely consistent with the rationale of uniform, nondiscriminatory rates underlying the *Farley* decision.

The State of Texas, through its Attorney General, in its presentation to the Court, branded the Burlington Northern with an abuse of its monopoly power by displaying a cavalier and callous attitude and accused it of avaricious greed in negotiating with shippers until they have selected a source of supply and the route of transportation, and then increasing the rate to the detriment of the shippers and the consuming public.

The I.C.C. has labeled the conduct of the railroad as amounting to "bait and switch tactics" I.C.C. Docket No. 36970, *Annual Volume Rates on Coal—Wyoming to Flint Creek, Arkansas,* ____ I.C.C. ____, (Mimeo Decision decided May 25, 1979, p. 7); citing Docket No. 36792, *Incentive Rate on Coal—Belle Ayr, WY, to Council Bluffs, IA,* ____ I.C.C. ____ decided June 15, 1978, but has concluded it is without the power to compel the railroad to file the "agreed" rate. This Court labors under no such limitation.

There is included in the function of the I.C.C. the duty to maintain a viable and healthy national rail transportation system. Clearly, such function is in the national interest and would supersede the interest of parties to an individual contract. While the I.C.C. may not compel the carrier to publish a specific rate, it does have the power and responsibility to determine whether a rate published is reasonable and in the furtherance of the national interest. The determination of reasonableness of a rate has been recognized to be an inexact science, and one that falls within zones. *Atchison, Topeka & Santa Fe Ry. Co. v. Wichita Board of Trade,* 412 U.S. 800, 824–825, 93 S.Ct. 2367, 37 L.Ed.2d 350 (1972). In other words, a rate may be reasonable and therefore lawful for a particular situation if it accomplishes the statutory requirements of the I.C.C., even though the zone into which the rate may fall may be broad.

To hold that the managerial prerogative of the railroad to publish a rate is cloaked with sanctity, while the managerial prerogative that resulted in the agreement to publish a specific rate may be blithely disregarded, lacks the ring of reason and is in the opinion of this Court not in the national interest.

This Court recognizes that the primary jurisdiction of the I.C.C. is such that when it determines a published rate to be outside the zone of reasonableness, then any contract that was productive of the particular rate being published must yield to such determination insofar as the rate structure is concerned. However, until such time as the determination of unlawfulness or unreasonableness is made by the I.C.C., this Court specifically holds that the railroads can be held to their agreement to publish particular rates. This Court does not condone the conduct of the Burlington Northern and is unwilling to permit the purposeful violation of a legitimate agreement.

The reasons for the Court's opinion are set out below in the Court's findings of fact and conclusions of law.

## FINDINGS OF FACT

1. Plaintiff Southwestern Electric Power Company (SWEPCO) is a corporation incorporated under the laws of the State of Delaware, having its principal place of business at 428 Travis Street, Shreveport, Louisiana 71156.

Defendant Burlington Northern, Inc., (BN) is a corporation incorporated under the laws of the State of Delaware, having its principal place of business in the State of Minnesota, at 176 East Fifth Street, St. Paul, Minnesota 55101.

Defendant The Kansas City Southern Railway Company (KCS) is a corporation incorporated under the laws of the State of Missouri, having its principal place of business at 114 West 11th Street, Kansas City, Missouri 65105. KCS has been duly authorized to transact business as a foreign corporation in the State of Texas.

Defendant Louisiana & Arkansas Railway Company (L&A) is a corporation incorporated under the laws of the State of Delaware, having its principal place of business at 114 West 11th Street, Kansas City, Missouri 64105. L&A has been duly authorized to transact business as a foreign corporation in the State of Texas.

2. In the spring of 1972, the Plaintiff and Defendant railroads commenced negotiations for the transportation of coal from the AMAX Coal Company, located near Gillette, Wyoming, to Plaintiff's power plant at Welsh, Texas.

3. The negotiations between Plaintiff and Defendant railroads had progressed by April 22, 1972, to the point that the Plaintiff received from Defendants Burlington Northern and The Kansas City Southern Railway Company a preliminary price quotation for the shipment of coal, subject to annual escalations. This preliminary price quotation of the rail rate reflected sufficient progress in the negotiation process that Plaintiff was able to enter into a 25-year contract with AMAX for the purchase of 175-million tons of coal, with the reasonable reliance that the contract with the railroads concerning the rate and shipment of coal would be concluded in final form

during the normal course of the negotiation process.

4. After the AMAX–SWEPCO contract was completed, Plaintiff SWEPCO and the Defendant railroads began negotiations on a rate schedule, and to determine who was to provide the cars, construct the maintenance facilities and build the additional tracks to facilitate the transportation between Welsh, Texas, and Gillette, Wyoming. In July, 1974, Plaintiff and Defendants reached an agreement that the Plaintiff would own the cars used to transport the coal, and the parties also agreed on maintenance and additional track provisions.

5. A letter of understanding reflecting the agreement was received by the Plaintiff from the Defendants Burlington Northern and The Kansas City Southern Railway Company dated September 20, 1974, and the letter of understanding was accepted and acknowledged by the Plaintiff. The Plaintiff made a commitment to ship coal over a period of twenty-five (25) years, and the Defendant railroads agreed to initiate and charge tariffs in accordance with a rate schedule contained in the letter of understanding. Setting an initial rate of $6.12 per ton for transportation of the coal from Gillette, Wyoming, to Welsh, Texas, in cars owned by the Plaintiff, the rate schedule also contained an escalation formula to be applied annually. Additionally, the rate schedule contained a clause referred to by the parties as the "gross inequities" clause, which provided that inequities resulting from the rate schedule formula failing to fairly cover cost changes brought about by unusual economic conditions were to be resolved by agreement between the Plaintiff and the Defendant railroads. The parties agreed to be bound by the tariff provided for in the rate schedule if an agreement could not be reached on a new rate higher than that provided for in the rate schedule.

6. In reliance upon the contract, Plaintiff SWEPCO constructed and placed into operation a coal-power electric generating unit at Welsh, Texas, at a cost of $128-million. Plaintiff also has under construction a second and third unit at Welsh, said units costing approximately $132-million and $156-million, respectively. In accordance with the provisions of the letter of understanding, Plaintiff has purchased 847 railroad cars to be used for the transportation of coal from Wyoming to Welsh, Texas (and also to another plant at Flint Creek, Arkansas), at a cost of $28.5-million. Further, the Plaintiff constructed a car maintenance facility in Alliance, Nebraska, at a cost of $3.5-million. Also, the Plaintiff, in accordance with provisions contained in the letter of understanding, constructed and installed track and coal unloading facilities at the Welsh plant at a cost of $3-million.

7. Pursuant to the rate schedule contained in the September 20, 1974, letter of understanding, Defendant railroads published the initial tariff for transportation of coal from Gillette, Wyoming, to Welsh, Texas, and the tariff became effective on November 8, 1976. Burlington Northern Freight Tariff 260, I.C.C. No. 419. The initial rate published (as escalated) was $9.85 per ton in unit trains subject to an annual minimum tonnage per year in shipper-owned cars.

8. The initial tariff has subsequently been republished, including escalations of the rate as called for in the agreement, in Freight Tariff BN No. 4175, I.C.C. BN 4175, and supplements thereto.

9. In accord with the provisions of the rate-schedule's escalation formula contained in the letter of understanding, the rate in effect was increased on July 1, 1977, to $10.65, increased again on July 1, 1978, to $11.35, and increased on July 1, 1979, to $12.12 per ton.

10. The agreed rate in effect since November 8, 1976, including escalations, has never been placed under investigation or otherwise challenged either by the I.C.C. or the Defendant railroads or any other person as being in any way unreasonable or otherwise unlawful under the Interstate Commerce Act.

11. Plaintiff complied with the contract and has tendered to the Defendant railroads for transportation over the lines of

the Defendants in excess of 4.2-million tons from November 1976 through June 30, 1979, and has paid to the Defendant railroads transportation charges in accordance with said agreement.

12. In reliance upon the provisions of said agreement, SWEPCO made investments totaling many millions of dollars in rail-related facilities, including coal cars, unloading facilities, repair facilities, and side tracks. In reliance upon the provisions of said agreement, Plaintiff constructed electric-generating units at Welsh, Texas, and presently has under construction additional units. In further reliance upon an anticipated agreement with the railroads, SWEPCO signed a 25-year contract with AMAX Coal Company for the purchase of a total of 170-million tons of coal to be delivered from AMAX'S Wyoming mines.

13. AMAX'S mines in Gillette, Wyoming, from which Plaintiff purchases coal in accordance with the 25-year contract between AMAX and SWEPCO, is served exclusively by the Defendant Burlington Northern.

14. Pursuant to the "gross inequities" clause contained in the rate schedule, in August, 1978, the Defendant railroads and Plaintiff began negotiations seeking to adjust the tariffs called for by the rate schedule contained in the letter of understanding. Plaintiff SWEPCO, by applying the railroad's cost, revenue and capitalization formula, has indicated that it would accept an increase in the tariff of $1.39 per ton above the rate called for by the rate schedule; while the formula contained in the letter of understanding currently calls for a rate of $12.12, Plaintiff SWEPCO, in an attempt to reach an agreement under the "gross inequities" clause, offered to accept a rate of $13.51, effective July 1, 1979.

15. In accord with the provisions of the agreement between SWEPCO and the railroads, specifically the "gross inequities" clause accompanying the escalation formula attached to said agreement (Exhibit "A" to the Complaint for Declaratory Judgment, p. 11 of 11), SWEPCO has agreed that the Defendants could put into effect a rate not in excess of $13.51.

16. The Defendant railroads rejected Plaintiff SWEPCO'S offer of $13.51 per ton made during negotiations under the gross inequities clause.

17. Plaintiff SWEPCO and the Defendant railroads have not been able to agree to a mutually acceptable rate above that called for by the rate schedule. The duly established rate presently in effect is $12.12 per ton, the rate called for by the rate schedule and escalation formula contained in the letter of understanding of September 20, 1974.

18. Contrary to the provisions of the letter of understanding, Defendant railroads stated their intent to raise the rate to Welsh, Texas, above the contract rate, presently $12.12 as escalated July 1, 1979, to a rate of $15.86 effective July 31, 1979. Although a verified complaint and protest was filed by Plaintiff SWEPCO with the Interstate Commerce Commission, requesting the Commission to exercise its discretionary power to suspend the effectiveness, the Commission, on July 30, 1979, voted not to suspend the effectiveness of the $15.86 rate as *prima facie* unlawful under the Interstate Commerce Act, 49 U.S.C. § 10701, et seq., but did order an investigation into the lawfulness of the tariff schedule to be instituted.

19. The increased tariff proposed by the Defendant railroads and protested by the Plaintiff SWEPCO, to $15.86, is $3.74 per ton, or 31%, above the $12.12 escalated level on July 1, 1979, called for by the provisions contained in the letter of understanding, and $2.35 above the $13.51 level which would not be challenged by SWEPCO. Based upon average tonnage per train of 10,671.37 tons experienced from 1/1/79 through 6/30/79, the additional $2.35 per ton transportation charge would cost $25,-077.72 per trainload. Based on 1978 tonnage to Welsh, the proposed $15.86 rate will cost SWEPCO an additional $3.7-million per year. Based on the expected volume of coal during the next year, the $2.35 above the $13.51 level agreed to by SWEPCO under the gross inequities clause would cause an injury to SWEPCO of $4,441,500.00.

20. If the Defendants had not been temporarily restrained and enjoined from breaching and otherwise violating the provisions of said agreement, they would have, effective at 12:01 a. m., July 31, 1979, breached the agreement by putting into effect a rate of $15.86, which is $3.74 per ton above the level called for in the agreement, as escalated, and $2.35 per ton above the level which SWEPCO is willing to accept under the gross inequities clause.

21. If the injunction against the railroads acting in breach of their agreement is not continued as a preliminary injunction, the railroads will act in violation of the letter of understanding by putting into effect a rate of $15.86 as the duly established rate which would have to be paid by SWEPCO.

## CONCLUSIONS OF LAW

1. This Court has jurisdiction over this action under 28 U.S.C. § 2201.

■ 2. The course of conduct taken by Plaintiff SWEPCO and the Defendant railroads duly established a specific rate schedule and tariff provisions and a procedure for periodic escalation of that agreed rate. For purposes of issuance of a preliminary injunction by this Court, the agreement between SWEPCO and the railroads as reduced to writing in the letter accepted September 20, 1974, and the exhibits thereto, has all the prerequisites of a formal, binding contract and is enforceable in a court of law through an action to prevent a breach of contract. The parties negotiated the contract rate schedule in good faith and intended to be bound by it. It was the intention of both Southwestern Electric Power Company and the Defendant railroads that the tariff provisions of the letter of understanding of September 20, 1974, required the railroad to put into effect and keep in effect the tariff provisions, including the escalation formula, subject to review of the I.C.C. Both parties intended this rate schedule to effectively function within the regulatory scheme of the I.C.C.

■ 3. Enforcement of the agreement binding the Defendant railroads to put into effect a specific tariff will not contravene the statutory scheme of the Interstate Commerce Act. Enjoining the Defendant railroads from performance of any act that would violate the agreement as to tariffs to be put into effect will not invade the primary jurisdiction of the I.C.C. to determine the lawfulness of any filed tariff, including the rate level as escalated that the parties agreed would be submitted by the Defendant railroads. The Court has not been asked to and is not suspending any tariff, nor is this Court suspending any tariff or extending an I.C.C.-ordered suspension period contrary to *Arrow Transportation Co. v. Southern Ry.*, 372 U.S. 658, 83 S.Ct. 984, 10 L.Ed.2d 52 (1963); *United States v. SCRAP*, 412 U.S. 669, 93 S.Ct. 2405, 37 L.Ed.2d 254 (1973). This injunction in no way prevents or interferes with the full and unlimited authority of the I.C.C. to investigate and determine the lawfulness of any tariff filed by the Defendant railroads pursuant to the agreed rate schedule. This Court is not making any determination as to reasonableness and lawfulness of the agreed rate, nor is the Court determining the $15.86 rate proposed by Defendant railroads to be unlawful. An injunction preventing the establishment of a rate deviating from the agreed rate schedule and tariff provisions will not contravene the policy of the Interstate Commerce Act that rates be uniformly available to all. The applicability of the tariff established pursuant to the agreement of the parties is available to any shippers, including those at intermediate points, who meet the tariff provisions and ship coal under similar conditions. This Court is requiring the Defendant railroads to submit the tariff they agreed to charge Southwestern Electric Power Company to the I.C.C., and that tariff is available to all shippers.

■ 4. A duly established tariff must be in accord with the provisions of the Interstate Commerce Act and not in contravention of any legally binding court order.

■ 5. A carrier has the right to initiate rates and adopt the policy of rate-

making that it deems to be wise, subject to the Commission's review power. *U. S. v. Illinois Central Railroad Company*, 263 U.S. 515, 522, 44 S.Ct. 189, 68 L.Ed. 417 (1924). The carrier's right to initiate rates includes the right to contractually limit this managerial prerogative by agreeing to publish, put into effect, and keep in effect specific rate and tariff provisions, always subject to the Commission's review powers. A contractual limitation on the right to publish rates is not inconsistent with the regulatory scheme contemplated by the Interstate Commerce Act.

6. With respect to this and similar agreements, including escalation agreements, the Interstate Commerce Commission has stated:

(a) We find, that the complained-of-rates on unit-train and trainload movements of coal subject to private agreement based on escalation formulae, most of which are exempted from this increase, are not in violation of the Act; that, as long as the rates charged are on file with the Commission, no violation of Section 6 exists; that, as far as can be determined all such rates are on file with the Commission, and the petitioner has not alleged otherwise; that the documentation of negotiations and/or the agreements themselves leading to the construction of a specific rate are not required to be filed under Section 6 of the Act; that such rates being exempted from this increase do not make those coal rates which took the increase unjust and unreasonable under Section 1(5) of the Act; that petitioner's contentions do not support a finding of violations of Section 3(1) of the Act; that these same contentions were adequately resolved by Division 2 in *Coal-Southwestern, Western & Central Territories*, 352 ICC 594 (1976).

Ex Parte 318, *Increased Freight Rates and Charges*—1976, ___ I.C.C. ___ (Order dated February 24, 1977, served March 2, 1977; Exhibit 32 herein).

(b) We have stated that so long as such voluntarily established rates are reasonable or otherwise lawful, we would not interfere with the carrier's managerial prerogatives [to initiate rates].

I.C.C. Docket 36970, *Annual Volume Rates on Coal—Wyoming to Flint Creek, Arkansas*, ___ I.C.C. ___, (Mimeo Decision decided May 21, 1979, served May 25, 1979, p. 8, *Flint Creek*); I.C.C. Docket I. & S. No. 9199, *Unit Train Rates on Coal—Burlington Northern, Inc.*, ___ I.C.C. ___, (Mimeo Decision decided and served July 13, 1979, p. 18, *Council Bluffs*).

(c) The evidence establishes that the parties had an understanding that BN would move the IPL coal from the AMAX mine near Gillette to Council Bluffs at a specified rate subject to a cost escalation agreement. Whether this understanding constitutes an enforceable contract is a matter to be determined by a court. *Council Bluffs*, I & S 9199, et al), *supra* at 17.

▮▮▮▮ The I.C.C. is not a court of general jurisdiction and its limited scope of powers does not include authority to determine whether this agreement is a binding contract; further, the I.C.C. does not have the jurisdiction to force a railroad to publish an agreed rate. The I.C.C. functions in the specialized, limited area of determining the reasonableness of rates. A shipper and carrier can commit themselves to abide by a particular rate schedule, whether or not this is incorporated into a formal contract, and an injunction prohibiting a variance from the agreed rate to be published does not invade the primary jurisdiction of the Commission to determine the reasonableness of that rate.

▮▮▮ The Interstate Commerce Act refers administrative questions to the Commission, and the Commission has exclusive jurisdiction over violations of the Act that require a technical determination. Reparations, cease and desist orders, whether a rate falls within the zone of reasonableness, and suspension order decisions are examples of technical determinations that are confined to the Commission by the Act. However, the federal courts retain jurisdiction where the claimant relies on common law grounds of contract or tort and does not ask

the Court to invade the primary jurisdiction of the Commission by making a technical determination. Jaffe, *Primary Jurisdiction*, 77 Harv.L.Rev. 1037, 1038 (1964). No technical determination is being made by this Court. The issue of contract law before this Court is not a technical decision committed exclusively to the I.C.C. by Congress; indeed, it is this Court's opinion that the I.C.C. does not have the power or competence to decide such a question.

█ 7. Under the tariff and rate schedule agreed to by the parties, should the railroads feel that the rate specified as escalated is not adequately compensatory, the Defendant railroads can rely on the gross inequity provision and negotiate with Southwestern Electric Power Company for a mutually agreeable higher rate. Should negotiations break down, as they apparently have in this case, and agreement on a higher rate becomes impossible, it is implied in the contract as a matter of law that the Defendant railroads could petition the I.C.C. for a determination of a reasonable rate. By announcing an intention to publish a rate that was not acceptable to Southwestern Electric Power Company, the Defendant railroads acted in violation of the agreed-to-procedures, and it is the intent of this Court to prevent such a breach from occurring.

█ 8. This Court is not interfering with any I.C.C. order declining to suspend the Defendants' unilateral determination of the tariff to be published, as that tariff had not yet been published when this Court entered its restraining order preventing a breach of the contract by the Defendant railroads. The Interstate Commerce Act, 49 U.S.C. § 10101 prohibits deviation from the lawfully published rate in effect, duly established in accordance with law.

In *Farley Terminal Co. v. Atchison, T & SF Ry, supra*, the Plaintiff claimed damages for breach of an agreement where a published tariff exceeded that called for by the agreement. The Ninth Circuit held that the published tariff must prevail over the pre-existing agreement in order to avoid discrimination and nonuniformity as

contemplated by the Interstate Commerce Act. Here, the contract rate does not deviate from the duly established tariff in effect; where there is no deviation, enforcement of the contract does not conflict with the statutory scheme of the Interstate Commerce Act. The only I.C.C. action regarding the $15.86 tariff has been a no-suspension order. The $15.86 tariff has not been published, and this Court's temporary restraining order prevents it from becoming duly established. Thus, *Farley* is distinguished from the present situation, as here enforcement of the contract rate is not inconsistent with the duly established tariff. *Farley* established that a contract rate is rendered void by subsequently established tariffs that are inconsistent. *Id.*, at 1098–99. By enjoining the Defendant railroads from publishing a tariff inconsistent with the rate contract they agreed to be bound by, this Court has prevented the discrimination and deviation that led the Ninth Circuit to render void the contract rate in question in *Farley*.

█ 9. If the Defendant railroads were to be allowed to act in breach of the agreement by actually putting into effect or duly establishing a rate in excess of that called for in the agreement, such duly established rate would have to be paid by Southwestern Electric Power Company, and Southwestern Electric Power Company would have no action at law for the recovery of damages caused by the breach of the agreement. *Farley Terminal Co. v. Atchison, T & SF Ry. supra*. The agreement binding the Defendant railroads to file the specified rate, subject to I.C.C. approval, was valid when made and continues to retain its validity; however, should a duly established tariff rate which is inconsistent with the agreed rate be published, the agreement would be unenforceable to the extent of the variance. *Id.* An injunction preventing actions in breach of the valid agreement will prevent the contract from being rendered void or voidable.

█ 10. Any right which Southwestern Electric Power Company has under

the Interstate Commerce Act to recover reparations in a claim brought before the I.C.C. for damages resulting from having to pay a duly established rate higher than that called for in the agreement could only be based on a Commission finding that the rate is unreasonable or above a maximum reasonable rate. 49 U.S.C. § 10701. There is no provision of the Interstate Commerce Act allowing recovery for damages measured by the breach of the agreement; the I.C.C. provides no remedy allowing recovery for the difference between the duly established rate and the agreed rate level. Should the tariff level called for by the rate schedule and escalation clause become inconsistent with the goals of the National Transportation Policy at a later date, the Commission has the power to revise the rate schedule and escalation clause without affecting the viability of the entire contract. Southwestern Electric Power Company has no adequate remedy at law for the recovery of damages caused by the breach of the agreement by the Defendants; thus, Southwestern Electric Power Company would be irreparably injured were the Defendants to be allowed to publish a rate higher than that called for in the agreement. In addition, the Court notes that consumer-customers of Southwestern Electric Power Company would also be irreparably injured by the breach of the agreement to the extent the increased costs to Southwestern Electric Power Company resulting from the breach would be recoverable from those consumers.

11. Plaintiff would suffer irreparable injury if the breach of the agreement is not enjoined.

12. Some or all of any increased fuel costs resulting from higher transportation costs caused by any breach of the agreement may be allowed to be passed through to Southwestern Electric Power Company's customers in a subsequent increase of the electrical power rate approved by the state regulatory commission. Any contractual arrangement that Southwestern Electric Power Company may have with third parties, subject to approval by the Public Utility Commission of the State of Texas, does not inure to the benefit of the Defendant railroads so as to allow actions in violation of the agreed-upon rate schedule. Furthermore, a pass-through arrangement Southwestern Electric Power Company has with third parties does not negate the irreparable nature of the injury suffered by Southwestern Electric Power Company and its customers that would be caused by breach of the agreement, since damages could not be recovered under *Farley*. Also, the Court notes that the recovery of the resulting increase in fuel costs by Southwestern Electric Power Company from its customers is not assured because changes in fuel costs to customers are reviewed on a regular basis by the state regulatory commission and may be disallowed. *Public Utility Commission of Texas Substantive Rules*, 952.02, 03, 033(b)(2)(D) (June 1978).

13. There is a combination of Plaintiff's probable success on the merits and the possibility of irreparable injury to Plaintiff. *Washington Metropolitan Area Transit Commission v. Holiday Tours*, 182 U.S.App. D.C. 220, 223, 559 F.2d 841, 844 (D.C.Cir. 1977).

14. Plaintiff has raised questions going to the merits so serious, substantial, difficult and doubtful, as to make them fair ground for litigation and thus for more deliberative investigation. *Ibid.*

15. Serious questions are raised, and the balance of hardships tips sharply in Plaintiff's favor. *Ibid.* 182 U.S.App.D.C. 220, 559 F.2d 841.

16. There is a substantial likelihood that Plaintiff will prevail on the merits. *Allison v. Froehlke*, 470 F.2d 1123, 1126 (5th Cir. 1972)

17. The threatened injury to Plaintiff caused by a breach of the agreement outweighs the threatened harm an injunction may cause the Defendants, since Plaintiff could not recover damages caused by the breach of the agreement, and the Defendants can be protected by the equitable powers of the Court against any revenue loss caused by the injunction if Plaintiff does not ultimately prevail on the merits.

18. The public interest favors the granting of this preliminary injunction requiring the Defendant railroads to abide by their agreement to submit rates pursuant to the rate and tariff schedule. The public interest favors the honoring of contracts setting rates that have been negotiated in good faith. It is in the national interest to have long-term shipper-carrier agreements setting rates to be applicable in the future, so long as those rates do not violate the National Transportation Policy of Congress, as implemented by the I.C.C.'s determination of reasonableness. Requiring the Defendant railroads to refrain from actions in breach of their agreement does not interfere with the primary jurisdiction of the I.C.C. Although the I.C.C. does not require submission of contracts when new tariffs are initiated, it has recently expressed its opinion that the regulatory scheme of the Interstate Commerce Act permits "contract rate-making" and that "contract rates have a number of significant transportation benefits . . . [including] increased certainty . . . ." Ex Parte No. 358–F, *Change of Policy, Railroad Contract Rates (General Policy Statement)*, 361 I.C.C. 205, 206–207 (1979). Forcing the defendant railroads to honor the commitment they made in exchange for promises from Southwestern Electric Power Company in no way interferes with the primary jurisdiction of the I.C.C. or the regulatory scheme of the Interstate Commerce Act. It should once again be noted that the contract rate is subject to a Commission decision on its reasonableness.

It is consistent with the public interest to permit parties to agree on courses of conduct to be followed in the future with maximum freedom as long as such conduct is not prohibited by, in conflict with, or repugnant to, any regulatory scheme established by statute. The power of the I.C.C. to modify a rate schedule contained in a long-term contract does not abrogate common law contract rights and remedies, but is instead complementary of such rights; this notion of parallel powers is desirable in light of the view that agency and court jurisdiction should be flexibly reconciled and accommodated. See *Pan American World Airways, Inc. v. United States*, 371 U.S. 296, 331, 83 S.Ct. 476, 9 L.Ed. 325 (1963) (J. Brennan dissenting). Long-term agreements between shippers and carriers on a procedure to be followed in duly establishing tariffs, subject to I.C.C. review, are not in conflict with or repugnant to the regulatory scheme of the Interstate Commerce Act. Such agreements are permissible, and their validity is to be determined according to the principles of the common law of contracts; indeed, it is the duty of this Court to protect the reliance interests and expectations of parties that enter into such agreements. The Interstate Commerce Act's regulatory scheme abrogating common-law rights by implication should be narrowly construed, since repeal of common law rights by implication is not favored. *Texas and Pacific Ry. v. Abilene Cotton Oil Co.*, 204 U.S. 426, 435–6, 27 S.Ct. 350, 51 L.Ed. 553 (1907).

The function of the Commission is to eliminate abusive practices in national transportation; the powers of the Commission are not so all-inclusive as to supersede all jurisdiction of the courts. It is consistent with the regulatory scheme of the Interstate Commerce Act for judicial jurisdiction to be retained where the cause of action rests solely on common law grounds and resolution of the controversy does not require a technical determination by the Court. Jaffe, p. 1039.

The public interest favors the encouragement of coal use and the conversion of boilers from natural gas to coal. See "Power Plant and Industrial Fuel Use Act," PL 95–620, 42 U.S.C. § 6211 *et seq.* (effective November, 1978). A preliminary injunction preventing the breach of this agreement will further this important national policy.

19. Any finding of fact which is a conclusion of law is adopted as such, and any conclusion of law which is a finding of fact, is adopted as such

IT IS BY THE COURT ORDERED that Plaintiff Southwestern Electric Power Company post bond in the amount of FIVE

524

HUNDRED THOUSAND DOLLARS ($500,000.00). This bond is in lieu of and replaces the TWO HUNDRED FIFTY THOUSAND DOLLARS ($250,000.00) bond that this Court ordered the Plaintiff to post in connection with the Temporary Restraining Order of July 30, 1979. This Court retains jurisdiction of this case to the extent of allowing the Defendant railroads to re-petition the Court for a new bond at any time the present bond is inadequate due to a time lapse creating a large accumulation of the difference between rates provided for in the agreement and the rate this injunction prevents the Defendant railroads from publishing.

IT IS BY THE COURT, this 13th day of August, 1979, ORDERED that the Defendants be and they are hereby restrained and enjoined from doing any act or failing to do any act, whether by putting into effect any supplement or amendment to their tariff, including I.C.C. Tariff BN 4175 or otherwise, that would result in an applicable rate different than that specified in the September 20, 1974, letter of understanding set forth as Exhibit "A" to Plaintiff's Complaint for Declaratory Judgment and for Injunctive Relief against Breach of Contract, or that would increase the rate for the movement of coal in unit trains and shipper-owned cars from Wyoming above the rate provided for in said agreement of the parties and escalations contained therein, subject to review of the I.C.C., including any agreement between the parties pursuant to the gross inequities clause of said agreement calling for a higher tariff, until such time as there is an adjudication of the matters raised in said Complaint.