The HANNA MINING COMPANY, Plaintiff,

v.

The ESCANABA AND LAKE SUPERIOR RAILROAD CO., Defendant.

Civ. A. No. 80–73567.

United States District Court,
E. D. Michigan, S. D.

Oct. 1, 1980.

David K. McDonnell, Andrew M. Zack, Michael B. Staebler, Detroit, Mich., John K. Maser, III, Nicholas J. DiMichael, Washington, D. C., for plaintiff.

John H. Caldwell, Larry H. Mitchell, Washington, D. C., Mark G. Mishek, St. Paul, Minn., Joseph H. Dettmar, Washington, D. C., for defendant.

## MEMORANDUM OPINION AND ORDER DENYING PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION AND GRANTING DEFENDANT'S MOTION TO DISMISS COMPLAINT

PHILIP PRATT, District Judge.

On September 17, 1980, this Court entered a Temporary Restraining Order and Order to Show Cause in the above–captioned case. The order "temporarily restrained and enjoined" the Escanaba and Lake Superior Railroad Company (the E&LS) "from doing any act, whether by putting into effect any supplement to its tariffs, or otherwise, or by failing to act . . ." where the effect of the action or inaction would be to violate an agreement entered into in 1968 between the plaintiff, the Hanna Mining Company (Hanna) on one hand, and the Chicago, Milwaukee, St. Paul and Pacific Railroad (the Milwaukee) and the Chicago & North Western Railroad (C&NW) on the other. In addition, the order directed the E&LS to appear before this Court "to show cause, if any there may be, why a preliminary injunction should not be issued in this action as prayed for in the complaint."

With the consent of the parties, the Interstate Commerce Commission (ICC) was permitted to intervene. On September 25, 1980, the Court heard arguments on the Order to Show Cause. The parties stipulated that the Temporary Restraining Order should remain in effect until the Court issued its decision concerning the preliminary injunction.

### A. Factual Background

On August 13, 1980, the E&LS filed two tariffs with the ICC, to become effective on September 18, 1980. Filing tariffs is simply the act of publishing printed statements of proposed rates with the ICC. The first of the tariffs filed by the E&LS would cancel its participation with the Chicago and Northwestern Railroad (the C&NW) in a joint rate of $1.80 per ton on iron ore from Randville, Michigan to Escanaba, Michigan, a total of 66.2 miles. The second would establish a new rate of $.90 per ton applicable over the 12.2 mile segment of the line from Randville to Iron Mountain, Michigan, the part of the 66.2 mile haul that constitutes the line of the E&LS. The net effect of these two tariffs would be that movement of iron ore from Randville to Escanaba would be governed by a combination of two local rates rather than one joint rate. The cancellation of the joint rate would make effective an existing single car rate of either $4.90 or $5.46 per ton over the 54 mile segment of the C&NW, in addition to the new rate of $.90 per ton charged by the E&LS, for a total charge of either $5.80 or $6.36 per ton for shipments of iron ore between Randville and Escanaba.[1]

On September 3, 1980 Hanna filed a protest with the ICC against both the proposed cancellation and the new E&LS proportional rate. Hanna asked the ICC to suspend E&LS's proposed tariffs because those rates allegedly are in contravention of a 1968 agreement to which the E&LS is bound. Hanna argued that the published tariffs are far in excess of the agreed–to rate of $1.80.

Then on September 17, 1980 Hanna filed its Complaint in the case at bar, seeking:

---

1. The parties disagree as to the proper calculation of the effects of the new rates.

(1) a declaratory judgment that the 1968 agreement is binding on the E&LS "with respect to the tariff rates ... to be placed into effect ... and to be charged"; (2) a temporary restraining order; and (3) a permanent injunction preventing E&LS from charging any rate other than that specified in the 1968 agreement.

At 3:00 P.M. on September 17, 1980 the ICC issued its decision on Hanna's protest and request for suspension. ICC Decision No. 37507, Suspension Case No. 70143. The ICC declined to suspend the rates or prevent them from becoming effective on September 18, 1980; but the ICC did order an investigation to determine, among other things, "whether or not a contract exists" and "the effect of the alleged contract on the rate level". *Id.* at 3.

Later on the afternoon of September 17, 1980, after conferring with counsel for E&LS and Hanna, this Court issued its Temporary Restraining Order enjoining E&LS from charging the published tariffs.

## B. JURISDICTION

The Interstate Commerce Act, 49 U.S.C. § 10101, *et seq.*, provides that railroads must publish proposed rate changes with the ICC at least 30 days before the new rates are to become effective. 49 U.S.C. § 10762. The ICC has primary jurisdiction to determine the lawfulness and reasonableness of railroad rates. 49 U.S.C. § 10701 *et seq.*; *Arrow Transportation Co. v. Southern Railway*, 372 U.S. 658, 668, 83 S.Ct. 984, 989, 10 L.Ed.2d 52 (1963). The ICC also has the power to suspend the implementation of proposed rates if it appears likely that the rates may be unlawful and harmful, or the ICC may decline to suspend the proposed rates, permitting the rates to take effect automatically. 49 U.S.C. § 10707. In either case, the ICC has the authority to conduct an investigation to determine the lawfulness of the rates, and eventually to cancel them if deemed to be unlawful. 49 U.S.C. § 10708, *Id.*

It is apparent that Congress entrusted special authority in the ICC to determine questions of railroad ratemaking. Conse-

quently, the threshold issues in the case at bar are jurisdictional. Does the Court have jurisdiction to enjoin a railroad from putting into effect duly published rates when the ICC has decided to allow those rates to take effect pending an investigation into their lawfulness? And, more specifically, does it make a difference that in this case the Court is asked to assert its common law jurisdiction to enjoin a breach of contract?

The resolution of the jurisdictional issues is controlled by Supreme Court decisions which have consistently and unequivocally held that Congress conferred upon the ICC "the sole and exclusive power to suspend" published tariffs, and that Congress "meant thereby ... to withdraw from the judiciary any pre–existing power to grant injunctive relief". *Arrow Transportation, supra* at 667, 83 S.Ct. at 988.

In the *Arrow* case the ICC had suspended a schedule of reduced railroad rates pending an investigation and the determination of their lawfulness. The ICC, however, had not finally decided the rate question within the suspension period. As a result, according to the statute, the proposed change of rate was to go into effect automatically. The petitioners in *Arrow* sued to enjoin the railroads from implementing the rate changes until the ICC's final decision. The District Court held that it had no jurisdiction to grant injunctive relief. The Court of Appeals and Supreme Court affirmed.

The *Arrow* opinion warrants extensive quotation for its illuminating exposition of the relationship between the ICC's suspension power and the Courts' equity jurisdiction.

"The Interstate Commerce Commission was granted no power to suspend proposed rate changes in the original Act of 1887. That power first appeared among the 1910 amendments introduced by the Mann–Elkins Act. The problem as to whether the application of new rates might be stayed pending decision as to their lawfulness first emerged after the Commission was empowered by the Hepburn Act of 1906 to determine the validity of proposed rates. In the absence of

any suspension power in the Commission, shippers turned to the courts for injunctive relief. The results were not satisfactory.

\*　　\*　　\*　　\*　　\*　　\*

"In its Annual Reports for the three years before 1910 the Commission had directed attention to the fact that such courts as entertained jurisdiction were reaching diverse results, which engendered confusion and produced competitive inequities. ... the regulatory goal of uniformity was jeopardized by the diverse conclusions reached by different District Courts—even, it appears, as to the reasonableness of a particular rate change. This resulted in disparity of treatment as between different shippers, carriers, and sections of the country, causing in turn 'discrimination and hardship to the general public.' "

*Id.* at 663–664, 83 S.Ct. at 986–987.

The Supreme Court reached broad conclusions:

"[W]e cannot suppose that Congress, by vesting the new suspension power in the Commission, intended to give backhanded approval to the exercise of a judicial power which had brought the whole problem to a head.

\*　　\*　　\*　　\*　　\*　　\*

"We cannot believe that Congress would have given such detailed consideration to the period of suspension unless it meant thereby to vest in the Commission the sole and exclusive power to suspend and to withdraw from the judiciary any pre–existing power to grant injunctive relief. This Court has previously indicated its view that the present section had that effect. In *Board of Railroad Comm'rs v. Great Northern R. Co.*, 281 U.S. 412, 429, 50 S.Ct. 391, 396, 74 L.Ed. 936, Chief Justice Hughes said to the Court: 'This power of suspension was entrusted to the Commission only.' The lower federal courts have also said as much. And the commentators on the matter have consistently supported the soundness of that view."

*Id.* at 664, 667–668, 83 S.Ct. at 987, 988–989.

In sum, the Court noted with approval, "courts consistently decline to suspend rates when the Commission has refused to do so." *Id.* at 670, 83 S.Ct. at 990.

Ten years after *Arrow* the Supreme Court reaffirmed these principles in *U. S. v. Students Challenging Regulatory Agency Procedures (SCRAP)*, 412 U.S. 669, 93 S.Ct. 2405, 37 L.Ed.2d 254 (1973). In the *SCRAP* case the ICC declined to suspend a 2.5% surcharge proposed by the railroads, while the ICC investigation of the increased rates continued. Various environmental groups sued to enjoin both the ICC and the railroads from implementing the new rates. The environmental groups claimed that the new rates permitted by the ICC were unlawful because of certain provisions of the National Environmental Policy Act, 42 U.S.C. § 4332(2)(C). A three–judge District Court granted the injunction: the Supreme Court reversed on the basis of *Arrow* :

"From the language and history ... of the Interstate Commerce Act, we concluded that Congress had vested exclusive power in the Commission to suspend rates pending its final decision on their lawfulness, and had deliberately extinguished judicial power to grant such relief. The factual distinctions between the present cases and *Arrow* are inconsequential.... *Arrow* was grounded on the lack of power in the courts to grant any injunction before the Commission had finally determined the lawfulness of the rates." *Id.* at 691, 93 S.Ct. at 2417.

Finally, and most recently, the Supreme Court reiterated the principles of *Arrow* and *SCRAP* in *Southern R. Co. v. Seaboard Allied Milling Corp.*, 442 U.S. 444, 99 S.Ct. 2388, 60 L.Ed.2d 1017 (1977). The Court observed once again that it is "absolutely clear" that Congress intended to commit the rate suspension power to the "unfettered discretion" of the ICC. *Id.* at 460, n. 14, 99 S.Ct. at 2397. Furthermore, judicial interference with the suspension and investigation procedures of 49 U.S.C. § 10707

would have disruptive consequences. *Id.* at 460, 99 S.Ct. at 2397.[2]

The apparent upshot of the *Arrow–SCRAP* line of Supreme Court decisions is that this Court has no jurisdiction to enjoin published rates from taking effect when the ICC has decided to investigate, but not to suspend, those rates. Hanna seeks to avoid this seemingly ineluctable conclusion with the argument that the Court still does have jurisdiction to enjoin a breach of contract. Acknowledging that the ICC has special statutory functions, and special expertise, Hanna argues that the Court retains its traditional common law jurisdiction to enforce contracts and that none of the cited Supreme Court cases involved a request to enjoin rate changes predicated on the ground that such changes constituted a breach of contract. Moreover, Hanna asserts, two very recent federal court decisions give direct support to the theory that injunctions based on the parties' contract are excepted from the *Arrow–SCRAP* rule of exclusive ICC jurisdiction.

Hanna relies on *Iowa Power and Light Co. v. Burlington Northern* (8th Cir. Feb. 12, 1980) and *Southwestern Electric Power Co. v. Burlington Northern (SWEPCO),* 475 F.Supp. 510 (E.D.Tex.1979). These cases both held that:

> "a railroad, as a common carrier under ICC jurisdiction, may be *injunctively* compelled to abide by a contractual freight rate until such time as the ICC determines that the contract rate has become unlawful or no longer falls within the zones of reasonableness."
>
> *Iowa Power,* plaintiff's Attachment B, at 17.

In *Iowa Power* the ICC had suspended proposed tariffs pending investigation; then the ICC issued a final decision canceling the proposed rate increase but setting a new rate somewhat less than the requested rate and substantially more than the rate speci-

fied in the parties' agreement. At that point Iowa Power sued to enjoin the railroad from charging any rate other than the contract rate.

The situation in *SWEPCO* is even more analogous. There after the railroad announced its intention to increase rates, the ICC decided to investigate but not to suspend the new tariffs. Before the new rates became effective the shipper sued to prevent the railroad from implementing any rates in excess of those contained in the contract.

In appraising *Iowa Power* and *SWEPCO* the Court must note at the outset that these cases are of dubious precedential value. *SWEPCO* is currently pending appeal to the Fifth Circuit. *Iowa Power,* which was a two–to–one decision over the strong dissent of Chief Judge Lay, is currently pending rehearing *en banc* before the Eighth Circuit.

Beyond this, *Iowa Power* and *SWEPCO* are distinguishable from the case at bar in a crucial respect. At the time of *Iowa Power* and *SWEPCO* the ICC maintained a policy of virtually ignoring the parties' contract in determining what rates would be reasonable and lawful. In both *Iowa Power* and *SWEPCO* the ICC had expressly declined to consider the effect of the parties' pre–existing agreement, declaring that this was a matter for the courts. *See, Iowa Power, supra,* at 7–8; *SWEPCO* at 515, 520. The Courts in *Iowa Power* and *SWEPCO* evidently believed that the parties' contract warranted consideration in some forum; besides, the ICC had apparently abdicated jurisdiction over the contract issues to the courts. In addition, in both *Iowa Power* and *SWEPCO* the ICC itself had expressed disapproval of the railroads' breach of the contract, yet the ICC considered itself powerless to enforce the contract rate. *E. g., SWEPCO* at 515; *Iowa Power,* at 12, 14, 18 ("the distinctive feature of the present case ...

---

**2.** The *Southern Railroad* case arose in a different procedural context and thus its holding is not directly applicable to the case at bar. *Southern Railroad* was not a suit for injunctive relief, but an appeal from an ICC decision not

to investigate a proposed rate change. The Court's formal holding was that ICC suspension and investigation decisions under 49 U.S.C. § 10707 are unreviewable.

is the attitude of the ICC towards breach"). Thus, by enforcing the contract rates, the courts in *Iowa Power* and *SWEP-CO* appeared to carry out the wishes of the ICC and exercise a power the ICC did not possess or was, at least, loath to exercise. The courts concluded that there was no danger of trampling on the toes of the ICC.

The situation is starkly changed in the case at bar. The ICC's new policy is "to consider claims by shippers that the rate change is in excess of a contract" and, in appropriate cases,

"to suspend the rate change and/or ultimately to find that the change is unreasonable and unlawful and to prescribe a rate that conforms to the contract."

ICC Ex Parte No. 358–F "Change of Policy, Railroad Contract Rates", (February 21, 1980).

The ICC's new policy is based on its understanding that

"it is ... well established that a court has no power to suspend or enjoin the effectiveness of a rate on file with the Commission."

*Id.* (citing *Arrow* and *SCRAP*).

Moreover, in the dispute between Hanna and the E&LS the ICC specifically has declared that it is applying its new policy with regard to contracts.

"In the matter here before us, we are concerned with the effect of the alleged contract on the rate level. We are ordering an investigation of the proposed cancellation for the purpose of determining whether or not a contract exists governing the rate."

ICC Decision No. 37507 "Rates on Iron Ore, Randville to Escanaba Via Iron Mountain" (September 17, 1980), page 3.

But the ICC refused to suspend the new rates now, indicating a provisional determination that the new rates are not unlawful or unreasonable. So, unlike the situation in *Iowa Power* and *SWEPCO*, a court injunc-

tion would encroach upon territory claimed by the ICC, overruling the ICC's preliminary decision as to the enforceability of the contract rates.[3]

Finally, and most fundamentally, there is no reason in this case to deviate from the Supreme Court decisions in *Arrow* and *SCRAP*. Under the definitive teaching of those decisions there is no warrant for an exception which would permit equity jurisdiction to enforce contract rates. The Supreme Court has repeatedly spoken in unqualified terms about the courts' utter lack of jurisdiction to enjoin rates published in accordance with the Interstate Commerce Act, whatever the asserted ground for injunctive relief. For instance, in *Arrow* the Court found "a clear congressional purpose to oust judicial power". *Arrow*, 372 U.S. at 671, n. 22, 83 S.Ct. at 991. Congress "withdr[e]w from the judiciary *any* pre-existing power to grant injunctive relief". *Id.* at 667, 83 S.Ct. at 991 (emphasis supplied).

The Supreme Court also addressed the question of possible exceptions to the jurisdictional rule embodied in the Interstate Commerce Act. In *Arrow* it was suggested that the courts were authorized to issue an injunction to enforce the policy and provisions of the National Transportation Policy. The Court responded that

"nothing in the National Transportation Policy ... indicated that Congress intended to revive a judicial power which we have found was extinguished when the suspension power was vested in the Commission."

*Arrow* at 673, 83 S.Ct. at 992.

Similarly, in *SCRAP* the Court was faced with a claim that the published rates were illegal under the National Environmental Protection Act. The Court held once again that the courts' equity jurisdiction had been abolished by the Interstate Commerce Act, and that only clear evidence of a congressional intent to reinstate that jurisdiction

---

**3.** Aside from discerning some distinguishing features between the *Iowa Power* and *SWEPCO* scenarios and the case at bar, in candor and with all due respect, this Court finds the logic and reasoning to be stilted and overly technical and, hence, unpersuasive. By contrast, the dissenting opinion of Chief Judge Lay in *Iowa Power* is compelling in its analysis of the issues and its application of the previously described rulings of the Supreme Court.

would permit a court to enjoin the allegedly illegal rates. Yet the Court found

"nothing either in the language or history of NEPA that suggests a restoration of previously eliminated judicial power."

*SCRAP*, 412 U.S. at 695, 93 S.Ct. at 2420. Similarly here there is nothing in the language or history of the Interstate Commerce Act, or in any Act of Congress, to indicate that the courts retain jurisdiction to enjoin published rates at variance with contract rates.[4]

The policy rationale underlying *Arrow* and *SCRAP* also prohibits the Court from assuming jurisdiction in this case. The Supreme Court observed that judicial injunctions against published rates would cause serious mischief and upset the regulatory scheme for ratemaking. The uniform policy of the ICC would be undermined if different courts intruded into the process, reaching diverse results. The judiciary's proper role in the scheme comes into play on appeal from the ICC, not in collateral attack before the ICC proceedings are completed and an appeal taken. The injunctive remedy would require prior judicial comment on the lawfulness of the rates, thus risking inconsistent results (if, for example, the Court enforced the contract rate but the ICC later decided that the contract rate was unlawful and unreasonable).

*See generally, Arrow* and *SCRAP.*

Hanna argues that this case poses no problem of duplication or interference between the Court and the ICC because the issues in the two forums are different and call for entirely distinct decisions which could not conceivably conflict. Hanna argues first, that the Court will not have to decide the reasonableness of the proposed rates. It asserts that the Court will not have to second–guess the merits of the technical determination within the ICC's special competence but need only decide whether there is an enforceable contract. Hanna stresses that *Arrow* is distinguisha-

ble because there the Supreme Court's concern centered on the plaintiff's request that the Court review the reasonableness of the rates.

The Court finds Hanna's argument unpersuasive. First, the Supreme Court in *Arrow* did not hold that equity jurisdiction did not attach simply because the Court was asked to decide the reasonableness of the rates. As clarified in *SCRAP*, where the Court was called upon to decide the impact of the NEPA, rather than the reasonableness issue which would be before the ICC, the Court said,

"we found in *Arrow* that any survival of a judicial power to grant interim injunctive relief would represent an undesirable interference with the orderly exercise of the Commission's power of suspension. Similarly, to grant an injunction in the present context, even though not based upon a substantive consideration of the rates, would directly interfere with the Commission's decision as to *when* the rates were to go into effect, and would ignore our conclusion in *Arrow* that 'Congress meant to foreclose a judicial power to interfere with the *timing* of rate changes which would be out of harmony with the uniformity of rate *levels* fostered by the doctrine of primary jurisdiction.'"

*SCRAP* at 697–698, 93 S.Ct. at 2421 (original emphasis); *see also, Arrow*, 372 U.S. at 668, 83 S.Ct. at 989.

Moreover, this case does call for some evaluation of the merits of the question before the ICC. As the Supreme Court stated in *Arrow*,

"A court's disposition of an application for injunctive relief would seem to require at least some consideration of the applicant's claim that the carrier's proposed rates are unreasonable."

*Arrow* at 669–670, 83 S.Ct. at 990–991.

Because *injunctive* relief is requested the Court must necessarily consider not only

---

4. Hanna has alerted the Court to proposed legislation which would arguably affect the outcome of this case. However, the Court cannot decide the case on the basis of legislation

which has not been, and may never be, passed by Congress and signed into law by the President.

the legal claim (based on contract) but the reasonableness of the relative hardships and the public interest—precisely the factors which the ICC will consider. The inescapable fact is that the ICC has been presented with the same claims, arguments, and information presented to this Court, yet the ICC has decided, as a preliminary matter, that the published rates should go into effect. To enjoin this result, the Court would have to decide, as a preliminary matter, that the ICC was wrong, that the rates should not go into effect. *See also, Iowa Power* at 33 (Lay, Chief Judge dissenting).

The second thesis of Hanna's argument is that the ICC will not decide the contract issue which is before the Court. Hanna concedes that the ICC will consider the contract as one factor in its final decision, but, according to Hanna, the *only* factor for the Court to consider is the contract. Moreover, Hanna asserts, the ICC's final decision will not necessarily resolve Hanna's contract claim. Even if the ICC approves of the rate increases, or of some rate less than that requested but more than that in the contract, this would not mean that the contract rate had been ruled unlawful or unreasonable, because there is a zone of lawful, reasonable rates. Thus by enforcing the contract, the Court would not rise the possibility that the ICC would pass on this precise question and come to a conflicting conclusion.

Again, Hanna's argument is ingenious, but flawed. The ICC in this case has specifically declared that it is investigating the proposed rate changes *precisely because* they may be in violation of the parties' contract.[5] And even on Hanna's theory that there may be a zone of lawful rates it is possible that the ICC will expressly rule that the contract rates are unlawful, thus coming into conflict with the Court. Furthermore, it appears that Hanna's theory about a zone of lawful rates is incorrect. There is only one legal rate; the rate duly established in accordance with the Act "has the force of statute and is binding on carrier and shipper alike", superseding prior rates. *Farley Terminal Co. v. Atchison T. & S. F. Ry.*, 9th Cir., 522 F.2d 1095, 1098 and n. 2; *Iowa Power, supra,* at 30–31 (Lay, Chief Judge dissenting). So the ICC's final decision may very well conflict with a court injunction.

In conclusion, for all the foregoing reasons, Hanna's Motion for a Preliminary Injunction is DENIED and E&LS's Motion to Dismiss the Complaint is GRANTED. The Temporary Restraining Order is extinguished.

IT IS SO ORDERED.

---

5. Any error in the ICC's treatment of the parties' agreement is cognizable on review of the ICC decision.