stant case was that the award of back pay should be reduced by the amount which would be due for 30 days.

Plaintiff's further contentions that the arbitrator placed the burden of proof upon the employer and that the award is violative of public policy have been considered and are hereby denied.

It follows from the foregoing that plaintiff's motion for summary judgment should be and it is hereby overruled and the alternative motion to remand the grievance to another arbitrator should be and it is hereby overruled, and that defendant's motion for summary judgment on its counterclaim should be and it is hereby sustained.

The CLEVELAND–CLIFFS IRON COMPANY, Plaintiff,

v.

CHICAGO & NORTH WESTERN TRANSPORTATION COMPANY, Defendant,

and

Interstate Commerce Commission, Intervenor.

No. M81–68 CA(2).

United States District Court, W. D. Michigan, N. D.

May 27, 1981.

Crowell & Moring, Washington, D. C., Warner, Norcross & Judd, Grand Rapids, Mich., for plaintiff.

Christopher A. Mills and John T. Van Gessel, Chicago, Ill., for defendant.

Kathleen M. Dollar, Acting Associate Counsel, ICC, Washington, D. C., for intervenor.

## OPINION GRANTING PRELIMINARY INJUNCTION

DOUGLAS W. HILLMAN, District Judge.

This is an action for declaratory and injunctive relief to enforce a rail tariff agreement between a carrier and a shipper and to enjoin the carrier from charging a higher rate set forth in a supplemental tariff which has been filed with the Interstate Commerce Commission (hereinafter "ICC"). Federal jurisdiction exists under 28 U.S.C. § 1332, and 28 U.S.C. § 1331, the federal question arising under Section 208(a)(i)(2) and (j) of the Staggers Rail Act of 1980, [49 U.S.C. § 10713(i)(2) and (j)].

The shipper, Cleveland-Cliffs Iron Company (hereinafter "Cleveland-Cliffs"), is the owner or long-term lessee of extensive iron rich properties in the Upper Peninsula of Michigan. Cleveland-Cliffs and groups of steel manufacturers have formed three partnerships which are engaged in the business of mining and pelletizing iron ore from the Republic, Tilden and Empire mines in the Marquette Iron Range. Defendant, Chicago & North Western Transportation Company (hereinafter "C&NW") is a rail carrier which in conjunction with the Lake Superior and Ishpeming Railroad,[1] transports iron ore and pellets from these mines to the port of Escanaba, Michigan.

In 1967, the C&NW began construction of a modern highly-mechanized iron ore transfer and storage facility in Escanaba. This new facility became operational in 1969. The facility has a current capacity to handle 10 million tons of ore annually and a potential capacity of 20 million tons.

In March, 1969, plaintiff and defendant entered into two agreements providing for the transportation of large amounts of iron ore and pellets to the Escanaba dock facility at bulk prices. The first of these agreements, the Marquette Range Agreement provides for the shipment of 1,500,000 long tons of ore from the Republic and Tilden mines to the C&NW Escanaba dock. The second agreement, the Empire Agreement, provides for the annual shipment of 2,210,000 tons of ore from the Empire Mine to Escanaba. The rates for these shipments were established by a tariff schedule incorporated into the agreements and subsequently filed with the ICC. The tariff provides for periodic price increases through an acceleration clause. The minimum life of the agreement extends to April 3, 1984, unless the mines permanently cease ore production.

Plaintiff asserts that the effect of this long-term rate agreement has been to lower ore transportation costs and thereby make the Marquette Range ore more competitive with other domestic as well as foreign ore. In response to this improved competitive posture, Cleveland-Cliffs and its partners have expended $1.14 billion in capital investments to triple the output of the Marquette Range mine and pellet facilities.

---

1. The Lake Superior and Ishpeming Railroad is not a party to this action.

Much of this capital investment program is debt financed.

Cleveland-Cliffs and the C&NW have observed the agreement for 12 years. On March 10, 1981, the carrier sought to increase the rail rate by filing a supplemental tariff with the ICC. On March 25, 1981, the shipper filed a complaint with the ICC asking the Commission to suspend the supplemental tariff before its effective date of April 25, 1981. On April 24, 1981, the ICC issued an order stating its intention to investigate the supplemental tariff but declining to suspend it. On that same day, and after the ICC decision, this court issued a temporary restraining order restraining the carrier's collection of the supplemental tariff rate.

The issue presently before the court is whether this temporary restraining order should be converted to a preliminary injunction. Prior to a hearing on this matter, the ICC moved the court to permit its intervention in this action. The Commission's motion was granted. Having considered the arguments and briefs submitted by counsel for the parties and the ICC, the court concludes that a preliminary injunction should issue.

## I. JURISDICTION

A threshold question is whether this court has jurisdiction to grant relief to prevent breach of a rate contract by enjoining a carrier from collecting a proposed new tariff which the ICC has decided to investigate, but declined to suspend.

It is plaintiff's claim that this court has jurisdiction to issue injunctive relief under § 208(a)(i)(2) and (j) of the Staggers Rail Act of 1980. Defendant and the ICC argue that the court is without jurisdiction on two grounds. First, it is claimed that by enjoining the use of the proposed tariff, the court is, in effect, suspending a new rate. The power to suspend a new rate has traditionally been within the exclusive jurisdiction of the ICC. Second, it is argued that the ICC has primary jurisdiction to consider the existence, reasonableness, and enforceability of a rate contract between a carrier and

shipper. Defendant and the Commission assert that the Staggers Act has no effect on the Commission's exclusive and primary jurisdictions where the contract in issue was executed before the effective date of the Act.

### A. Exclusive Jurisdiction of the ICC.

With respect to the ICC's claim of exclusive jurisdiction over this matter, it should be noted that the Staggers Act represents a major change in the legal principles and policies behind government regulation of the railroad industry. Prior to the Act, it was the national policy to establish and maintain "reasonable rates for transportation without unreasonable discrimination or unfair or destructive competitive practices ..." Interstate Commerce Act of 1978, Pub.L. 95–473, § 10101(a)(4), 92 Stat. 1337 (1978) (prior to 1980 amendment). This policy was to be affected by "the impartial regulation of the modes of transportation" by the ICC. *Id.* § 10101(a). The Staggers Rail Act of 1980 is designed to deregulate the rail industry. In large part, the specific policies comprising this deregulation are set forth in 49 U.S.C. § 10101a(1)–(3):

> "In regulating the railroad industry, it is the policy of the United States Government—
>
> (1) to allow, to the maximum extent possible, competition and the demand for services to establish reasonable rates for transportation by rail;
>
> (2) to minimize the need for Federal regulatory control over the rail transportation system and to require fair and expeditious regulatory decisions when regulation is required;
>
> (3) to promote a safe and efficient rail transportation system by allowing rail carriers to earn adequate revenues, as determined by the Interstate Commerce Commission."

The public policy behind the Staggers Act is that rates, where possible, should be established by rail carriers in response to market forces. *See,* 49 U.S.C. § 10701a(a). This general policy of market set rates is to

yield to a few specific rail policy concerns which justify rate regulation by the ICC. Specific rail policies requiring rate regulation include the policy of providing that a railroad earn a non-confiscatory rate [49 U.S.C. § 10701a(c)(1)], the policy of prescribing a reasonable maximum rate where the carrier exerts market dominance [49 U.S.C. § 10701a(b)(1)] and the policy against unlawful rate discrimination [49 U.S.C. § 10741].

Consistent with the general policy of market defined rates, Section 208(a) of the Staggers Act [49 U.S.C. § 10713(a)], authorizes a carrier to set rates through contracts with purchasers of rail service. Such contracts must be filed with and approved by the ICC. 49 U.S.C. § 10713(b) and (c). The Commission, on its own initiative, or on complaint, may conduct a limited investigation of the contract. 49 U.S.C. § 10713(d). Section 208(a)(i)(2) of the Staggers Act [49 U.S.C. § 10713(i)(2)] provides that the exclusive remedy for breach of a contract entered into under this section is an action in an appropriate state or federal court.

Prior to the Staggers Act, railroads were authorized to operate only as common and not contract carriers. The legal effect of a rail rate agreement was determined by the ICC in accordance with the legislative regulatory scheme established by the Interstate Commerce Act and the administrative policies of the ICC concerning rate agreements.

Under the legislative scheme set forth in the prior Interstate Commerce Act, all rates, whether established by contract or otherwise, were required to be published in the form of a tariff and filed with the ICC. A new tariff became effective after 30 days from the filing date. The ICC was authorized to investigate a new tariff to determine whether the rate was reasonable under statutory standards. An investigation could last a maximum period of ten months, at which time the Commission could approve the rate, disapprove the rate, or if no action was taken, the rate became effective by operation of law. Any rate which the Commission disapproved as unreasonable was cancelled and the Commission could

prescribe a reasonable rate. During the investigation of a new tariff, the ICC, in its discretion, was authorized to suspend the tariff. (See generally, Interstate Commerce Act of 1978, Pub.L. 95–473, § 10701, 92 Stat. 1371, § 10704, 92 Stat. 1373, and § 10707, 92 Stat. 1380 (prior to 1980 amendment.)

Collateral to its general duty to determine the reasonableness of new tariffs, the ICC had exclusive jurisdiction to consider the existence, reasonableness, and enforceability of any rate agreement at variance with the new tariff. Historically, the ICC has evolved an administrative policy that has given increasing legal effect to rate agreements. Initially the dicta of several ICC decisions declared that rate contracts were "per se illegal". *Guaranteed Rates, Sault Ste. Marie, Ontario to Chicago,* 315 ICC 311, 323 (1961). The Commission later determined that rail rate contracts had beneficial aspects and concluded that such agreements were not per se illegal and would be given an appropriate legal effect on a case-by-case basis. Ex Parte No. 358–F, *Change of Policy, Railroad Contract Rates* (General Policy Statement, served November 9, 1978). This policy was clarified to reflect the current ICC policy on rate agreements in a Commission statement issued February 10, 1980. Under current ICC policy, the Commission will consider a claim that a rate agreement exists between a shipper and carrier in determining whether a tariff in excess of the contract rate is a reasonable maximum rate. The Commission stated that contracts found to have been formed after the 1978 ICC policy statement would establish a presumption that the agreed rate is the maximum reasonable rate. The presumption of reasonableness is rebuttable on the carrier's demonstration that enforcement of the agreed rate would be inconsistent with the National Transportation Policy. Contracts formed prior to the 1978 policy statement would be given legal effect on a case-by-case basis. *See,* Ex Parte No. 358–F, *Change of Policy, Railroad Contract Rates* (served February 21, 1980).

The Staggers Act authorizes carriers to enter into contracts enforceable in a court of law. Prior to the Act, rate agreements were of uncertain legal effect and subject to ICC interpretation and enforcement. Congress sought to clarify the status of contracts formed before passage of the Staggers Act in Section 208(a)(j) [49 U.S.C. § 10713(j)]:

"The provisions of this section shall not affect the status of any lawful contract between a rail carrier and one or more purchasers of rail service that is in effect on the effective date of the Staggers Rail Act of 1980. Any such contract shall hereafter have the same force and effect as if it had been entered into in accordance with the provisions of this section. Nothing in this section shall affect the rights of the parties to challenge the existence of such a contract."

Section 208(a)(i)(2) creates a breach of contract remedy in an appropriate court for a contract formed under Section 208(a)(a). Section 208(a)(j) provides that a lawful pre-Act contract shall be given the same force and effect as a post-Act contract. Collectively these provisions extend a judicial cause of action for breach of contract to lawful contracts which predate the Staggers Act. *Metallurg, Inc. v. Burlington Northern, Inc.*, No. 3–81 Civ. 39 (D.C.Minn., April 10, 1981).

The apparent Congressional intent in creating a breach of contract action with respect to rail agreements is that such agreements are now to be governed by contract principles of the common law and applicable state statutory law. Injunctive relief in appropriate circumstances to avoid breach of contract has been a traditional remedy under contract law. It appears, therefore, that in providing that rail agreements are enforceable in a court under common law and statutory contract principles, Congress has authorized courts to enjoin when necessary the operation of a new tariff in variance with a contract rate.

The effect of an injunction from this court against the carrier's use of a new rate would operate as a suspension of a new tariff. Case law prior to the Staggers Act strongly suggests that power to suspend a new tariff was a matter in the discretion of the ICC and that federal courts were without injunctive power to augment or impair ICC discretion concerning rate suspension. *Arrow Transportation Company v. Southern Railway Company*, 372 U.S. 658, 83 S.Ct. 984, 10 L.Ed.2d 52 (1973); *United States, et al v. Students Challenging Regulatory Agency Procedures, (SCRAP), et al*, 412 U.S. 669, 93 S.Ct. 2405, 37 L.Ed.2d 254 (1973).[2] This authority insulating the ICC

---

**2.** The court construes the *Arrow* and *SCRAP* decisions to stand for the proposition that prior to the Staggers Act the ICC had exclusive jurisdiction to suspend a new rate and that federal courts were without injunctive power to interfere with ICC discretion regarding rate suspension. This interpretation of these cases was adopted by Judge Pratt in *Hanna Mining Co. v. The Escanaba and Lake Superior Railroad Co.*, 498 F.Supp. 1267 (E.D.Mich.1980), appeal pending (6th Cir.). In *Hanna*, on facts substantially identical to the present action, the district court concluded that *Arrow* and *SCRAP* barred the court from enjoining a tariff in excess of a previously established contract rate. *Hanna*, however, is distinguishable from the present case since *Hanna* was not decided under the Staggers Act, which had not been enacted at the time the district court rendered its opinion.

One other court has determined that, independent of the Staggers Act, a federal court has jurisdiction to issue an injunction to suspend a new tariff in excess of a pre-existing contract rate. *Southwestern Electric Power Company*

*(SWEPCO) v. Burlington Northern, Inc.*, 475 F.Supp. 510 (E.D.Tex.1979), appeal pending (5th Cir.). The *SWEPCO* decision is based on reasoning that a court has powers under the common law to enforce a rate contract pending an ICC determination that the contract rate is reasonable. The *SWEPCO* court determined that such preliminary injunctive relief would not interfere with the power of the ICC to suspend rates. In order to reach this decision, the *SWEPCO* court adopted a narrower interpretation of the *Arrow* and *SCRAP* cases. *Arrow* was interpreted as prohibiting injunctive relief where an injunction was being employed to artificially lengthen the statutory time period for which the ICC could suspend a proposed rate. Similarly, the *SCRAP* case was narrowly construed as holding that an injunction against an ICC rate decision was an inappropriate method of expanding statutory rights accruing under the National Environmental Policy Act of 1969. So construed, the *Arrow* and *SCRAP* decisions do not impair a court's injunctive

rate suspension power from judicial injunctive power is based on two-fold reasoning.

The primary reason for this insulation is that it reflected Congressional intent under the then existing rail regulatory scheme. In *Arrow Transportation, supra*, the United States Supreme Court conducted an exhaustive review of the history of the rate suspension power and concluded that Congress intended to vest in the Commission an exclusive power to suspend proposed tariffs and to withdraw from the court any pre-existing power to grant injunctive relief to parties complaining of a rate change. *Supra*, 372 U.S. at 667, 83 S.Ct. at 988. In the *SCRAP* case, the Court again noted this Congressional intent in holding that the National Environmental Protection Act did not by implication revive judicial injunctive power to suspend operation of a new rate. *SCRAP, supra*, 412 U.S. at 694, 93 S.Ct. at 2419.

A second reason for the withdrawal of judicial injunctive power is that the issuance of injunctive relief involves the court in a determination that a carrier's proposed tariff is unreasonable. Such an individual determination of the reasonableness of a rate would undermine the then existing national policy of uniform rate levels sought to be achieved through administrative supervision. *Arrow, supra*, 372 U.S. at 668, 83 S.Ct. at 989, *SCRAP, supra*, 412 U.S. at 696, 93 S.Ct. at 2420.

Neither consideration of prior Congressional intent, nor rate uniformity now prevent the court from issuing injunctive relief against a new tariff. Congressional intent has changed to permit such relief. The broad purpose of the Staggers Act is to release in some measure the rail industry from ICC regulation. Section 208 of the Act is designed to facilitate this deregulation by allowing carriers to enter into judicially-enforceable contracts. Given the role that Congress has fashioned for the courts with respect to rate agreements, it is appar-

ent that Congress no longer intends the ICC to have exclusive jurisdiction concerning rate suspension.

Congress has expressed an equally clear intent to abandon any policy of uniform rate levels by permitting carriers to contract for the sale of rate services. Obviously, such contract rates are set through the negotiations of private parties in response to market forces rather than by any uniform regulatory guideline.

After a careful examination of the Interstate Commerce Act, as amended by the Staggers Act, I am satisfied that the Act empowers a court to grant injunctive relief to enforce lawful rate contracts formed before or after the effective date of the Act. To the extent that this injunctive power operates to suspend a new rate, the ICC no longer has exclusive jurisdiction over rate suspension.

### B. Primary Jurisdiction.

The sole limitation which Section 208(a)(j) places on the jurisdiction of the court over pre-Act rate agreements is that such agreements must be "lawful". Two questions arise from this jurisdictional language. First, is it for the court or the ICC to determine when a rate agreement is lawful? Second, if the ICC has any role in determining the lawfulness of a pre-Act contract, is a court precluded from issuing injunctive relief in support of the contract until the ICC renders its lawfulness determination?

As commonly used, the word "lawful" means activity which is not illegal and is not contrary to public policy. The public policy component to a lawfulness determination indirectly raises the issue of the ICC's primary jurisdiction to construe rate agreements in light of specific rail regulation policies.

◼ Under the doctrine of primary jurisdiction, a court is to decline jurisdiction that an administrative agency might first determine a matter where the matter is within

---

power exercised in the course of common law contract principles.

While this narrow construction of the *Arrow* and *SCRAP* decisions is forceful, the court's

jurisdictional analysis of the Staggers Act makes it unnecessary to consider the merits of the arguments advanced in *SWEPCO*.

the agency's jurisdiction and is peculiarly subject to resolution by the agency's expertise. *United States v. Western Pacific Railroad Co.*, 352 U.S. 59, 77 S.Ct. 161, 1 L.Ed.2d 126 (1956). If a contract is claimed to be unlawful because it is illegal or contrary to the general public policies of contract law, courts are the competent forums to determine the lawfulness of the contract. Consequently, if a contract is alleged to be void as unconscionable, a court may properly adjudicate the lawfulness of the instrument.

By contrast, if a claim of unlawfulness relates to a technical implementation of a specific public policy which is within the jurisdiction and expertise of an administrative agency, the doctrine of primary jurisdiction may require the administrative agency to first consider the matter. Relevant in the present case is the strong public policy underpinning much of the regulation of the rail industry that carriers should not be held to rates which are confiscatory.[3]

The Interstate Commerce Act has long provided that rates must be established at a reasonable minimum level, such that the rate "contributes to the going concern value of the railroad." 49 U.S.C. § 10701a(c)(1), Interstate Commerce Act, Pub.L.No. 95–473, § 10701(b)(1), 92 Stat. 1371 (1978) (prior to the 1980 amendment). This determination involves a complex comparison of the rate revenue to the variable cost the railroad incurs for providing the service under the rate. 49 U.S.C. § 10701a(c)(2). The formulas and procedures for such an analysis are prescribed by the ICC. 49 U.S.C. § 10701a(c)(4)(A).

Clearly, the ICC has the administrative expertise to determine if a rate agreement is confiscatory. Some question exists, however, as to whether the ICC has jurisdiction to make this determination where a contract predates the Staggers Act.

Prior to the Staggers Act, the ICC was authorized to investigate, suspend and cancel confiscatory rates concerning any rail carrier. Interstate Commerce Act of 1978, Pub.L.No. 95–473, § 10707, 92 Stat. 1380 (1978) (prior to the 1980 amendment). Since the Staggers Act, the ICC has retained jurisdiction to investigate and cancel confiscatory rates concerning common carriers. 49 U.S.C. § 10701a(c). However, Section 208 of the Staggers Act divests the ICC of the power to investigate and cancel a post-Act contract rate on the grounds that the rate is confiscatory.[4]

**3.** The court notes that a substantial distinction exists between the common law doctrine of unconscionability and the regulatory policy against confiscatory contracts. Unconscionability is generally determined from circumstances existing on the date the parties entered into a contract. A determination that a contract is confiscatory may be based on circumstances which arise after the formation of the contract. Also, the unconscionability defense is a doctrine applied in factual circumstances where relief from a contract is equitable. In contrast, the determination that a rate is confiscatory is based on formulas comparing the railroad's rate revenue and variable costs.

**4.** The court's conclusion that the ICC no longer has jurisdiction to determine if a post-Act contract is confiscatory is based on a statutory analysis of Section 208, the legislative history of the Section, and the Commission's interpretation of this Section.

As noted earlier, contracts entered into under Section 208(a) must be filed with the ICC. [49 U.S.C. § 10713(c)] Within 30 days of the filing date of a contract, the Commission may, on its own initiative or by complaint, conduct an investigation. The scope of this investigation is considerably narrower than that allowed under previous law. [49 U.S.C. § 10703(c)] Where the rate contract relates to non-agricultural goods, the Commission shall approve a contract unless either of two circumstances appear: (1) that an individual shipper will be harmed because the proposed contract impairs the ability of the carrier to meet its common carrier obligations, or (2) that the proposed contract will result in an unreasonable discrimination against a port [49 U.S.C. § 10713(d)(2)(A)].

Once approved, the contract is immune from virtually all regulations under the Interstate Commerce Act. The Interstate Commerce Commission may not require that a carrier violate the terms of his contract except for reasons expressed in 49 U.S.C. § 11128, dealing with wartime transportation. Rate contract immunity from the provisions of the Interstate Commerce Act results from 49 U.S.C. § 10713(i)(1), which provides that:

"A contract that is approved by the Commission under this Section, and transportation under such contract shall not be subject to this subtitle, and may not be subsequently challenged before the Commission or in any

The fact that the ICC no longer has jurisdiction to determine if a post-Act contract is confiscatory does not necessarily mean that the Commission is without jurisdiction to investigate an alleged confiscatory pre-Act contract. The relevant legislative history behind Section 208(a)(j) and sound policy considerations suggest that the ICC has continued jurisdiction to inquire into any confiscatory effect of a pre-Act contract rate as part of a determination that the underlying contract is "lawful".

As noted above, Section 208(a)(j) provides that "lawful contracts" shall be given the same force and effect as contracts entered into under the Staggers Act. The sole legislative history of this subsection is the comments of Congressman Dingell, who sponsored the provision. In the course of the House floor debate on Section 208(a)(j), Congressman Dingell commented that:

"My amendment intends no worsening of any railroads' existing position under contracts outstanding when the new act becomes effective. *Railroads, particularly including those small and marginal lines whose very ability to serve could be impaired by inflexible contract enforcement will have the benefit of the same safeguards against confiscatory rates as are provided both under the existing law, and elsewhere under this new bill.*" [Emphasis added.]

126 Cong.Rec. H10085–86 (September 30, 1980).

Sound policy considerations also suggest that the ICC should be permitted to investigate confiscatory pre-Act contract rates. In limiting the power of the ICC to disapprove a post-Act contract rate as confiscatory, Congress has given carriers clear notice that they may contract and their bargains will be binding unless excused under contract law doctrines of unconscionability or perhaps impracticability. Presumably, if a carrier wishes to protect itself from a contract rate which is reasonable when made but which later becomes confiscatory, the carrier can include within his contract a savings clause which provides for definition of and excuse from a confiscatory contract rate. In contrast, carriers contracting prior to the Staggers Act had notice only of the ICC's then plenary power to grant relief from a confiscatory contract rate. In reliance on this regulatory scheme, the carrier had no cause to consider the need for a private caveat against a confiscatory contract rate. It is, therefore, unjust to deprive the carrier contracting before the Staggers Act of the substantial contract defense that the agreed rate is confiscatory.

Apart from considerations of fairness towards the contracting parties, permitting the ICC to determine that a contract is or is not unlawful as confiscatory furthers current national rail policy. Present rail policy envisions a competitive rail industry in which a carrier can earn adequate revenues and contribute to a safe and strong national rail service. By definition, confiscatory contract rates injure the health of an individual rail competitor and impair the strength and safety of the entire rail system.

 In light of the legislative history of Section 208(a)(j) and the above policy con-

---

court on the grounds that such contract violates a provision of this subtitle."

This immunization of an approved contract from ICC regulatory powers reflects the will of Congress. The summary of the House Conference Committee contains the following statement:

"Once a contract is approved by the Commission or goes into effect because the Commission has not acted within the specified time limits, the service provided under the contract is exempt, subject to the specific limitation of Section 11128 from all regulation and all of the requirements of the Interstate Commerce Act."

126 Cong.Rec.H. 9920 (Sept. 29, 1980). The ICC concurs with the conclusion that the Commission has lost its traditional jurisdictional review with respect to post-Act contracts.

"Section 10713 does not authorize the Commission to disapprove a contract that has been filed on grounds other than those specified in that section, such as that the contract establishes a rate that is unreasonably high or low."

ICC Interpretative Statement-Contract Rates, p. 4–5 (served November 5, 1980).

siderations, the court concludes that the ICC has continued primary jurisdiction to consider if a contract rate is confiscatory pursuant to a determination that a pre-Act contract is lawful.

The ICC also asserts that it has primary jurisdiction to implement a policy that carriers are entitled to a reasonable maximum rate with respect to pre-Act contracts. The court finds no basis for such jurisdiction in the language or the policies of Section 208 of the Staggers Act.

Section 208(a)(d) of the Staggers Act [49 U.S.C. § 10713(d)] limits the basis on which the ICC may investigate and disapprove a post-Act contract to two grounds: (1) that the contract will impair the carrier's ability to meet his obligations as a common carrier; and (2) the contract will result in an unreasonable discrimination against a port. Since Section 208(a)(j) gives the same force and effect to pre-Act contracts, presumably the ICC may regulate pre-Act contracts on these grounds. In addition, the court has already noted that a legislative history and policy of Section 208(a)(j) imply that the ICC has continued jurisdiction to declare a pre-Act contract unlawful if the rate is confiscatory. Apart from this contract rate regulation, it appears that that the ICC has no jurisdiction to consider a lawful maximum contract rate, at least where there is no allegation that the carrier enjoyed "market dominance". No statement within the legislative history of Section 208(a)(j) indicates a congressional intent to permit the ICC to determine maximum reasonable contract rates. Indeed, such jurisdiction would be contrary to prevailing national rail policy.

The reasonable maximum contract rail rate is what the market will bear. This is best determined by the unregulated freedom of a carrier and shipper to enter into contracts.

Arguably the ICC may have jurisdiction to review a pre-Act contract rate where the carrier enjoys "market dominance" as defined by the statute. 49 U.S.C. § 10709. Jurisdiction to review the maximum reasonableness of a pre-Act contract where one party has market dominance may comport with the statute's purpose of deregulation in competitive environments. However, the need for this regulation is questionable since pre-Act contracts are subject to the antitrust laws and the contract doctrine of unconscionability. In any event, whether the ICC has jurisdiction in market dominance situations is academic to the present case since no claim is made that the C&NW proposed tariff would violate the maximum reasonable rate provisions in market dominance circumstances under 49 U.S.C. § 10709.

In short, after a careful examination of the statutory scheme established under Section 208, the legislative history and policies of that provision, the court concludes that the ICC has primary jurisdiction to determine if a pre-Act contract rate is confiscatory. However, the ICC has no similar jurisdiction to determine that the contract reflects a reasonable maximum rate.

The conclusion that the ICC has jurisdiction to determine whether a contract is unlawful by being confiscatory does not bar the court from issuing preliminary injunctive relief pending the ICC determination. The intent of Section 208(a)(j) is to maintain the legal effect and the enforceability of contracts entered into prior to the Staggers Act. This purpose would not be advanced were this court to in effect suspend the operation of a contract until the ICC completes its investigation. The role Congress has intended for this court is to enforce lawful rail agreements. If under common law principles, the contract appears lawful, it shall be given effect in the courts until the courts are deprived of jurisdiction by an ICC finding that the contract is confiscatory. Judicial injunctive relief which supports the contract pending an ICC determination does not impair the agency's primary jurisdiction and yet fulfills the essential purpose of Section 208(a)(j) of the Staggers Act. Accordingly, the court concludes that it has jurisdiction to presently grant plaintiff preliminary injunctive relief.

## II. INJUNCTIVE RELIEF

The Sixth Circuit in *Mason County Medical Association v. Knebel*, 563 F.2d 256, 261 (6th Cir. 1977) has established four factors which should be considered in granting preliminary injunctive relief: (1) whether the plaintiff has shown a substantial likelihood of success on the merits; (2) whether the plaintiff has shown irreparable injury; (3) whether issuance of an injunction would cause substantial harm to others; and (4) whether the public interest is served by issuing preliminary injunctive relief.

■ The agreements in issue appear to establish definite terms of sale, including a definite tariff for described rail services. The contracts provide that:

"[s]o long as this agreement is in effect, North Western and Ishpeming will not directly or indirectly seek any change of substance in [the tariff] which would increase in any way the cost to Cliffs of the services contemplated by this agreement to be performed by North Western ..."

During the life of the agreement, the C&NW filed a tariff with the ICC which exceeds the contract rate. Properly escalated, the contract provides for a rate of $2.11 per ton for all mines. Under the supplemental tariff, rates of $3.75, $3.80 and $3.85 will be respectively charged for ore movement from the Empire, Tilden and Republic mines. Whether ultimately a breach of contract will be established is unclear at this early date but the definite nature of the contract obligations, and the, as yet uncontested, history of the conduct of the parties, support a conclusion that plaintiff is likely to succeed. Of course, this conclusion is highly tentative and is made without prejudice to defendant's right to present to this court any contract defenses it chooses to advance.

Plaintiff's likelihood of success is arguably diminished by the possibility of the ICC finding that the agreement is confiscatory. However, at this time, the court has no evidence before it to know whether the Commission will find the agreement confiscatory under the formulas and procedures used to make that determination.

As to the second factor, plaintiff asserts that two forms of irreparable injury will occur if injunctive relief is denied.

Generally, plaintiff claims that absent injunctive relief, plaintiff is without legal remedy because of the jurisdictional conflict between this court and the ICC. Plaintiff argues that unless the court enjoins the operation of a proposed rate, the court cannot later award damages for breach of contract since the effect of such a damage award would reduce transportation charges below the rate filed with the ICC. *Farley Terminal Co. v. Atchison, T and S F Ry*, 522 F.2d 1095 (9th Cir. 1975).

The *Farley Terminal* case predates the Staggers Act and presupposes that the ICC has the power to approve a rate in excess of a contract which is subsequently determined by a court to be lawful and breached. The Staggers Act has limited the ICC's regulatory control over contract rates. As earlier determined, it is the opinion of the court that the ICC has primary jurisdiction to determine if a pre-Act contract is unlawful because it is confiscatory. If the Commission decides that the contract is unlawful, the court is without jurisdiction to enforce it.[5] If the Commission determines that the contract is not confiscatory, the court has continuing jurisdiction to award damages for breach of the contract under Sections 208(a)(i)(2) and (j) of the Staggers Act. It appears, therefore, that if a valid contract exists, this court has jurisdiction to give plaintiff adequate legal relief.

---

**5.** The court expresses no opinion concerning any jurisdiction question that might arise should the ICC find a contract unlawful as confiscatory. In such an event, the ICC might claim jurisdiction to prescribe a minimum non-confiscatory rate under its powers to regulate common carriers. 49 U.S.C. § 10704(a)(1). Alternatively, a court might claim jurisdiction in appropriate circumstances under the familiar common law doctrine of quasicontract or promissory estoppel. The court expresses no view on the merits of these or any similar conflicting jurisdictional claims.

The court, however, concludes that unless preliminary injunctive relief is given, plaintiff will suffer irreparable injury to the financial structure of plaintiff's mining operations.

If imposed, the supplemental tariff will result in an increase in transportation costs of $16 million within the first year of its implementation. This increased transportation cost will result in either one of two financial consequences adverse to plaintiff: either the cost will be internalized into the price of Marquette ore, thus reducing its competitive quality and resulting in decreased sales of plaintiff's mining operation; or, plaintiff will absorb the price increase and cut profit margins.

By affidavit, the court has received detailed information concerning the quality of the Marquette Range ores and the fact that such ores are competitive only when coupled with a low transportation cost. The court has also learned that the particular steel manufacturers who are partners with Cleveland-Cliffs in this mining venture are financially fragile. One partner, McLouth Steel, reported a loss of $56.5 million in fiscal 1980. Other of the steel manufacturer partners operate on small profit margins. The court has also been made aware of the fact that the United States steel industry, in general, faces intense competition from foreign steel manufacturers. In short, the court concludes that irreparable injury to plaintiff's market share or the financial soundness of the steel manufacturer partners will occur if the operation of the new tariff is not enjoined.

The third criteria for injunctive relief is that others would not be substantially injured by the injunction. The only party whose rights are arguably jeopardized by this court's injunction is the C&NW. The C&NW can be adequately protected by a bond, escrow, or some other arrangement to be formulated by the parties and approved by this court.

The final criteria for injunctive relief is that the public interest be served by such an injunction. Courts both before and after the enactment of the Staggers Act have noted that public policy considerations support the use of preliminary injunctive relief to uphold rate agreements. As a pre-Staggers Act decision noted:

"The public interest favors granting of this preliminary injunction requiring the defendant railroads to abide by their agreement to submit rates pursuant to their rate and tariff schedule. The public interest favors the honoring of contracts setting rates that have been negotiated in good faith. It is in the national interest to have long-term shipper-carrier agreements setting rates to be applicable in the future, so long as those rates do not violate the National Transportation Policy . . ."

*Southwestern Electric Power Co. v. Burlington Northern, Inc.*, 475 F.Supp. 510, 523 (E.D.Tex.1979), appeal docketed, No. 79–3049 (5th Cir.).

Similarly, the only court to construe Section 208 of the Staggers Act has also concluded that preliminary injunctive relief is appropriate in support of a rate agreement.

"Section 208 of the Act recognizes that long-term contracts between railroads and their shippers are beneficial. Such contracts provide certainty as to the rate level to the shipper and at the same time guarantee the railroad that it will obtain the traffic.

The public interest requires that the parties honor such contracts."

*Metallurg, Inc. v. Burlington Northern, Inc.*, No. 3–81 Civ. 39, Op. at 9. Identical considerations of public policy support the granting of injunctive relief in the instant case.

For all of the reasons discussed above, the court determines that plaintiff Cleveland-Cliffs is entitled to injunctive relief. Plaintiff's motion for a preliminary injunction is granted. Defendant's motion to dissolve the temporary restraining order is hereby denied.

## ORDER GRANTING PRELIMINARY INJUNCTION

Upon consideration of the motion for preliminary injunction filed by plaintiff and

**410**

pursuant to Fed.R.Civ.P. 65, and for the reasons set forth in the court's opinion dated May 27, 1981,

IT IS ORDERED that defendant Chicago & North Western Transportation Company be and is preliminarily enjoined from doing any act or failing to do any act, other than authorized by this order, which action or inaction would violate the terms of the Marquette Range Agreement and the Empire Agreement, and, in particular, from directly or indirectly seeking any change of substance in Tariff ICC CNW 4004, supplements thereto, or successive issues thereof, other than as permitted in those agreements, which would increase in any way the cost to Cleveland-Cliffs of the services contemplated by those agreements;

IT IS FURTHER ORDERED that the parties shall promptly meet and make a good faith effort to draft a bond, escrow agreement or other mutually acceptable arrangement to adequately protect defendant pending final resolution, and, further shall present to the court within 45 days of the date of this order such document(s) for its approval;

IT IS FURTHER ORDERED that this preliminary injunction shall remain in effect until the ICC completes its investigation, or until the court enters its decision on the merits in this case, or until the further order of the court.

Nothing in this preliminary injunction shall prevent defendant from participating to the fullest extent in any investigation proceeding before the Interstate Commerce Commission.