**KANSAS CITY POWER AND LIGHT COMPANY, Plaintiff,**

v.

**BURLINGTON NORTHERN RAILROAD COMPANY, Defendant.**

No. 81–1056–CV–W–8.

United States District Court, W. D. Missouri, W. D.

March 17, 1982.

William L. Slover, Washington, D. C., A. Drue Jennings, Paul Anthony White, Kansas City, Mo., for plaintiff.

Thomas E. Deacy, St. Paul, Minn., Edward W. Mullen, Deacy & Deacy, Kansas City, Mo., Betty Jo Christian, Loren Kieve, Steptoe & Johnson, Chartered, Washington, D. C., for defendant.

## MEMORANDUM OPINION AND JUDGMENT

STEVENS, District Judge.

In this action plaintiff Kansas City Power and Light Company (KCPL) seeks to enjoin defendant Burlington Northern Railroad Company (BN) from collecting the tariff rate BN has published for the unit-train shipment of coal from Thunder Junction, Wyoming, to Sadler, Missouri. Plaintiff KCPL asserts that the shipment of coal from Wyoming to Sadler, Missouri, is governed by a rate contract and that the tariff proposed by BN is contrary to the provisions of that contract. Defendant BN contends, on the other hand, that no contract exists for this movement of coal and that it is entitled to collect the transportation rate established by the tariff filed with the Interstate Commerce Commission (ICC).

On December 31, 1981, this court issued a Temporary Restraining Order to prevent BN from charging a rate in excess of that in effect when this suit was filed on December 23, 1981. With consent of the parties, the court extended the Temporary Restraining Order and ordered a prompt trial on the merits, which was held February 23–25, 1982. See Fed.R.Civ.P. 65(a)(2).

The court has concluded that the Missouri Statute of Frauds renders the agreement between the parties unenforceable; therefore, the Temporary Restraining Order must be dissolved and judgment must be entered for defendant.

*Findings of Fact*

1. Plaintiff Kansas City Power and Light Company is incorporated under the laws of the State of Missouri, with its principal place of business at 1330 Baltimore Avenue, Kansas City, Missouri 64141.

2. Defendant Burlington Northern Railroad Company is incorporated under the laws of the State of Delaware, with its principal place of business at 176 East Fifth Street, St. Paul, Minnesota 55101.

3. KCPL maintains coal-fired generating units at LaCygne, Kansas, and Iatan, Missouri.

4. The rail station for LaCygne is Amsterdam, Missouri; for Iatan, the station is Sadler, Missouri.

5. In 1973 KCPL selected Iatan, Missouri, which is about thirty-one miles north of Kansas City, as the site for a new power plant. Iatan is located near the lines of, and is served exclusively by, BN.

6. By letter dated December 3, 1973, BN proposed a rate for unit-train shipments of coal from the Gillette, Wyoming, area to Iatan.

7. Construction on the new unit proceeded slowly for the next several years. Sporadic discussions and correspondence between the parties regarding the Iatan rate proved inconclusive.

8. On May 8, 1979, with less than three months remaining before shipments of coal were to commence, KCPL by letter urged BN to quote a rate to Iatan.

9. BN responded on June 12, 1979, with a proposal of $9.34 per ton; KCPL rejected this figure.

10. Thereafter in early July, BN filed with the ICC a "Notice of Intention" pursuant to 49 U.S.C. § 10729, specifying a rate of $9.34.

11. On July 27, 1979, KCPL informed BN that it would protest the rate proposal. In an attempt to avert this mutually distasteful litigation, KCPL suggested a compromise rate of $8.41 per ton.

12. BN responded on August 31, 1979, with a proposal of $8.82, and KCPL began to evaluate the new figure. BN thereafter withdrew its "Notice of Intention."

13. In the meantime, KCPL notified BN that shipments to the Iatan plant from the AMAX mine at Belle Ayr, Wyoming, would commence approximately August 1, 1979, even though no specific Iatan tariff was on file. Iatan (Sadler) is an intermediate point on the route over which coal is shipped from Belle Ayr to the KCPL unit at LaCygne, Kansas (Amsterdam, Missouri). The terms of the Amsterdam tariff permit shipments to an intermediate point albeit at the full rate, which was then $9.71 per ton. Coal movements to Iatan commenced under this provision.

14. During the last quarter of 1979 and the first quarter of 1980, negotiations over the Iatan rate continued with no greater success than before.

15. In a letter dated April 30, 1980, from Richard S. Sandgren, Assistant Vice President-Coal for BN, to Donald T. McPhee, Vice President-System Operations for KCPL, BN proposed a tariff rate for the movement of coal from Belle Ayr, Wyoming, to Sadler, Missouri, of $8.41 to be escalated July 1, 1980, at 100% of the "Index of Material Prices and Wage Rates" published by the Association of American Railroads (hereinafter AAR Index). As escalated, the rate would be $9.71. BN proposed that the rate thereafter be escalated semiannually at 100% of the AAR Index, with quarterly escalation for increased fuel costs. Finally, BN indicated it was willing to seek special permission from the ICC enabling it to pay reparations for excess charges incurred by KCPL in shipping Iatan coal under the Amsterdam tariff. (P.Ex. 32)

16. In his letter of April 30, 1980, Sandgren stated: "This quotation should not be considered as contract and under no circumstances should it be considered a commitment to a rate level on which any contract can be consummated." In a letter of August 31, 1979, to counsel for KCPL, Sandgren had included a caveat to similar effect: "At this time we are not prepared to look at a contract rate arrangement." These statements merely indicate that BN did not wish to utilize the procedures then in effect for filing a contract rate with the ICC.

17. On May 29, 1980, Sandgren and O.W. Cobb of BN met with McPhee and Arnold L. Samuels of KCPL in Kansas City. The parties reached a tentative agreement on the Iatan rate, which included the following terms. First, BN would file a tariff of $9.71 per ton and would seek special permission from the ICC to permit the tariff to take effect on July 1, 1980, with less than the normal 30-day notice period. Second, rate escalation thereafter would be 90% of the AAR Index and would occur

semi-annually except for fuel costs, which would be subject to quarterly escalation. Third, BN agreed to file a special docket application with the ICC, seeking permission to pay reparations to KCPL for excess charges incurred in shipping Iatan coal under the Amsterdam tariff. Finally, the parties agreed not to litigate the Iatan or Amsterdam rates.

18. On May 30, 1980, Sandgren summarized the results of the May 29 meeting in an internal memorandum. (P.Ex. 33)

19. Within a day or two after the meeting, KCPL confirmed the agreement in a telephone conversation between McPhee and Sandgren.

20. By letter to McPhee dated June 3, 1980, Sandgren confirmed and summarized the agreement as set forth above in paragraph 17. (P.Ex. 34)

21. On June 9, 1980, Cobb wrote McPhee stating: "I understand we are in agreement about the Iatan or Sadler rates." (P.Ex. 35)

22. Notwithstanding prior statements to the contrary, the statements and actions of BN officers at and after the meeting of May 29, 1980, demonstrate a willingness to enter a contract.

23. As McPhee testified, the Iatan agreement was for a period exceeding one year. The parties clearly assumed that any agreement would continue for some considerable time although its exact term is nowhere specified. A letter from Sandgren dated August 31, 1979, states that "the rate being quoted assumes a long term movement of coal over BN from Belle Ayr." In his memo of May 30, 1980, regarding the May 29 meeting, Sandgren recounts that McPhee stated if agreement were reached on the Iatan rate, there would be no litigation on the Amsterdam rate in the "foreseeable future." The Cobb letter of June 9, 1980, to McPhee states that "it was good for us to reach the compromise at Sadler, which lays to rest both the rates to Amsterdam and Sadler for the foreseeable future."

24. The phrase "foreseeable future" does not denote a specific length of time; moreover, no writing signed by BN contains any specific provision as to the duration of the agreement.

25. With ICC permission, Supplement 1 to BN Tariff 4198 covering unit-train shipments of coal from Belle Ayr and Eagle Junction, Wyoming, to Sadler, Missouri, took effect July 1, 1980. Its provisions accord with the May 29 agreement with minor modifications. (P.Ex. 38: McPhee to Sandgren letter, June 16, 1980)

26. In November, 1980, KCPL specifically informed BN for the first time that it would shift the origin of its Iatan coal from Belle Ayr to the ARCO mine at Black Thunder, Wyoming, which would result in an additional haul of twenty-one miles. During the negotiations in the spring of 1980, BN had known that KCPL's contract and options for coal from the AMAX mine at Belle Ayr did not extend beyond 1982. BN also knew KCPL was considering having its subsidiary, Wymo Fuels, Inc., open a mine to supply the Iatan plant. Therefore during the negotiations, BN had informed KCPL in a letter dated August 31, 1979, as follows: "While our quotation will apply from Belle Ayr, it should be understood that if in the future KCP&L should buy coal from any other source in the Gillette area, that a new quotation will be determined and the rate herein quoted will not apply."

27. During the final quarter of 1980, the rate for shipments from Belle Ayr to Sadler was $9.75 per ton. In an internal memorandum dated November 17, 1980, Sandgren calculated a new rate for Thunder Junction (the point of origin for Black Thunder coal) by extrapolating the ton-mile rate for Belle Ayr by an additional twenty-one miles. The calculation yielded a rate of $10.02 for Thunder Junction coal.

28. BN Tariff 4204 governing shipments of coal from Thunder Junction to Sadler took effect December 15, 1980. It set a rate of $10.02 until December 31, 1980, with a rate of $10.50 thereafter.

29. The Thunder Junction tariff is substantially similar to the Belle Ayr tariff. The change in points of origin is inconsequential as shown by BN's decision in De-

cember, 1981, to amend Tariff 4204 to permit shipments to Sadler from either Belle Ayr or Thunder Junction at the same rate.

30. During 1981, both tariffs remained in effect although shipments to Iatan moved only under the Thunder Junction tariff.

31. The Belle Ayr tariff was escalated as agreed on October 1, 1980. Both tariffs were escalated throughout 1981 pursuant to the same agreed escalation formula (90% AAR Index semiannually with quarterly adjustments for fuel).

32. Neither tariff obligates KCPL to ship any coal although the rate quoted in each tariff is subject to a specified minimum annual volume.

33. On June 15, 1981, Richard C. Grayson, President of BN, wrote to Arthur J. Doyle, who is described in the letter as President of KCPL, to explain BN's new policy regarding "letters of understanding" between it and unit-train coal shippers. In essence, Grayson stated that BN felt it had a statutory right to raise rates and would do so after consultations with shippers.

34. On December 7, 1981, BN filed Supplement 8 to Tariff 4204 (the Thunder Junction tariff), setting a rate of $12.90 for shipments of coal to Sadler, Missouri, from any of five origins in Wyoming: Thunder Junction, Belle Ayr, Caballo Junction, Eagle Junction, or Rawhide Junction. The $12.90 rate exceeds the rate that would otherwise obtain were the tariff escalated as previously agreed.

35. Also on December 7, 1981, BN cancelled the Belle Ayr tariff effective December 30, 1981.

36. The $12.90 rate would have taken effect December 30, 1981, if not restrained by this court.

### Conclusions of Law

1. This court has jurisdiction under 28 U.S.C. §§ 1331 and 1332.

2. On May 29, 1980, or shortly thereafter, the parties entered into a contract for the shipment of coal from Belle Ayr, Wyoming, to Sadler, Missouri, which specified the rate for such shipments as well as the method by which the rate would be escalated in the future.

3. Traditionally, the transportation of commodities by rail has been governed by tariffs subject to ICC review. Contracts between carriers and shippers simply had no place in this framework. Times change, however, and in 1978 the ICC set forth its new policy in Ex Parte No. 358–F (Nov. 9, 1978). Since several cases have recounted the turnabout in policy by the ICC and the parties are thoroughly familiar with the subject, this court will not address the issue in detail. *See, e.g., Iowa Power & Light Co. v. Burlington Northern, Inc.,* 647 F.2d 796 (8th Cir. 1981); *Cleveland Cliffs Iron Co. v. Interstate Commerce Commission,* 664 F.2d 568 (6th Cir. 1981); *Hanna Mining Co. v. Escanaba & Lake Superior Railroad,* 664 F.2d 594 (6th Cir. 1981); *Cleveland-Cliffs Iron Co. v. Chicago & North Western Transportation Co.,* 516 F.Supp. 399 (W.D. Mich.1981). Briefly stated, the ICC decided that rate contracts were not inherently unlawful, could be beneficial, and should be evaluated case by case. To this end, it permitted, but did not require, that contracts be filed with it under normal procedures.

4. The Staggers Rail Act of 1980, which took effect October 1, 1980, expressly permits contracts between rail carriers and shippers. 49 U.S.C.A. § 10713 (West Pamph.1981). Moreover,

> The provisions of this section shall not affect the status of any lawful contract between a rail carrier and one or more purchasers of rail service that is in effect on the effective date of the Staggers Rail Act of 1980. Any such contract shall hereafter have the same force and effect as if it had been entered into in accordance with the provisions of this section. Nothing in this section shall affect the rights of the parties to challenge the existence of such a contract.

*Id.* § 10713(j).

5. The parties vigorously dispute the meaning of the phrase "lawful contract" in the just-quoted provision. Although dubious about the existence of any lawful rate

contract prior to the Staggers Act, BN argues that the phrase can mean at most only those contracts entered after the 1978 ICC policy change *and* filed with the Commission. KCPL would place no such restrictions on the enforceability of pre-Staggers contracts. *See Metallurg, Inc. v. Burlington Northern, Inc.*, No. 3-81 Civ. 39 (D.Minn. April 10, 1981).

6. While the Staggers Act on one hand permits judicial enforcement of any lawful contract existing on the effective date of the Act, it leaves untouched "the rights of the parties to challenge the existence of such a contract." 49 U.S.C.A. § 10713(j). Obviously, an alleged rate contract is subject to the same defenses as any other contract.

7. It is unnecessary for this court to resolve the broader implications of the phrase "lawful contract" as used in section 10713(j) since the contract at hand runs afoul of the Missouri Statute of Frauds, which provides:

> No action shall be brought … upon any agreement that is not to be performed within one year from the making thereof, unless the agreement upon which the action shall be brought, or some memorandum or note thereof, shall be in writing and signed by the party to be charged therewith, or some other person by him thereto lawfully authorized ….

V.A.M.S. § 432.010 (West 1952).

8. By McPhee's testimony, plaintiff concedes that the contract sued upon was not to be performed within one year from the making thereof. Thus, it is subject to the statute of frauds.

9. A contract within the statute is voidable rather than void; in other words, the statute renders it unenforceable. *Community Land Corp. v. Stuenkel*, 436 S.W.2d 11, 18 (Mo.1968). *See also* 73 Am.Jur.2d *Statute of Frauds* § 513 (1974).

10. In order to satisfy the statute, "[t]he writing must contain all the essential terms of the agreement …." *Young v. A-T-O, Inc.*, 484 F.Supp. 626, 628 (E.D.Mo.1980). The essential terms of the contract may be gleaned from a series of writings or documents, *Bayless Building Materials Co. v. Peerless Land Co.*, 509 S.W.2d 206, 211 (Mo.App.1974); however, the statute of frauds is satisfied only if the interrelationship of the various writings can be demonstrated without resort to parol evidence. *Frostwood Drugs, Inc. v. Fischer & Frichtel Construction Co.*, 352 S.W.2d 694, 698 (Mo.1961); *Arnold v. Broadmoor Development Co.*, 585 S.W.2d 564, 566 (Mo. App.1979).

11. Several of the exhibits presented can be linked without resort to parol evidence. The Sandgren memo of May 30, 1980, specifically incorporates his letter of April 30, 1980, as setting forth the terms of the proposal discussed at the meeting of May 29, 1980. The subject matter of the Sandgren letter of June 3, 1980, and its reference to the May 29 meeting also demonstrate its relationship to the other writings. The Cobb letter of June 9, 1980, specifically refers to the "agreement about the Iatan or Sadler rates."

12. Taken as a whole at face value, these writings contain all the essential elements of the contract with one exception fatal to plaintiff's case: the term of the contract is unspecified. *See Young*, 484 F.Supp. at 628 (writings which failed to specify duration of alleged employment contract did not satisfy statute of frauds since essential term was missing). This court simply cannot accept plaintiff's contention that the enigmatic phrase "foreseeable future" specifies the duration of the contract. Even assuming that the phrase refers to the duration of the contract rather than the period of abstention from litigation, the phrase is entirely too vague to provide a basis upon which to bind BN for an extended period of time that might be as long as twenty years if the Amsterdam tariff were used as a measure.

13. The change of origin from Belle Ayr to Thunder Junction was contemplated by the parties at least in general terms. The manner in which the Thunder Junction rate was calculated and escalated clearly show it to be within the framework of the original agreement. Had that agreement been en-

forceable, the transfer to Thunder Junction could reasonably be construed and sustained as continued performance of the contract under a contingency previously contemplated by the parties rather than as a modification subject to the strictures of the statute of frauds; however, the original agreement is unenforceable and the events of November, 1980, in no way change its status.

14. KCPL argues in passing that partial performance of the contract takes it out of the statute of frauds, but the doctrine of partial performance has its "chief application" in the area of oral contracts for the sale or transfer of real estate. 73 Am. Jur.2d *Statute of Frauds* § 397 (1974).

> Generally, the mere part performance of an oral contract not to be performed within a year does not take it out of the operation of the statute of frauds in actions at law. Equity courts, however, have been more liberal in this respect, and have consequently held or recognized in some cases that such contracts can be taken out of the statute by part performance.

*Id.* § 505 (footnotes omitted). To enforce the contract for another eighteen years on the basis of two years of partial performance would be inequitable, particularly since KCPL would not be required to ship coal for the same period.

15. During the trial of this case, the court permitted the introduction of several exhibits of questionable relevance over the objection of BN. *Fields Engineering & Equipment, Inc. v. Cargill, Inc.*, 651 F.2d 589, 594 (8th Cir. 1981). The result reached here makes it unnecessary to set forth in detail which exhibits were considered and which were rejected.

For the reasons stated, it is

ORDERED that judgment is hereby entered in favor of defendant Burlington Northern Railroad Company and against plaintiff Kansas City Power and Light Company. It is further

ORDERED that the Temporary Restraining Order entered in this case on December 31, 1981, and thereafter extended to the present with consent of the parties is hereby dissolved. It is further

ORDERED that plaintiff Kansas City Power and Light Company shall within twenty days pay defendant those additional sums due under Supplement 8 to ICC BN Tariff 4204 on coal shipped during the life of the Temporary Restraining Order. It is further

ORDERED that within twenty days plaintiff shall compensate defendant for all costs and damages incurred or suffered by defendant as a result of the Temporary Restraining Order previously in effect. It is further

ORDERED that costs will be taxed to plaintiff.